Rebecca L. ISOM, Defendant–Appellant,

v.

John W. ISOM, Plaintiff–Appellee.

No. 49A04–8711–CV–342.

Court of Appeals of Indiana,
Third District.

May 18, 1989.

Aaron E. Haith, Indianapolis, for defendant-appellant.

Maxine T. Bennett, Indianapolis, for plaintiff-appellee.

GARRARD, Presiding Judge.

Rebecca Isom (Rebecca) appeals the granting by the Marion County Superior Court of a motion filed in 1987 by her former husband John Isom (John) to modify the child custody agreement then in

place regarding their now 5½ year old daughter Amanda. We affirm.

## I.  Issue

This case presents for review the following issue:

Did the trial court abuse its discretion when it concluded that there had been a substantial and continuing change of circumstances surrounding the custody of Amanda Isom and that the change warranted granting her father's motion for a modification of custody?

## II.  Facts

On October 26, 1984, the Marion County Superior Court granted John and Rebecca Isom an absolute dissolution of their 2½ year old marriage. After a contested hearing, the court granted custody of the Isoms' daughter Amanda, then thirteen months old, to Rebecca.

On December 26, 1984, two months after her divorce from John, Rebecca remarried. That marriage ended in divorce on November 26, 1985. After her first divorce, Rebecca had begun training to become and was subsequently employed as a hairdresser. She continued to work as a hairdresser until the summer of 1987, when she became a security officer with the Indiana University Police. Shortly after beginning work as a security officer, medical problems arising from injuries she had sustained in an automobile accident on January 30, 1987 forced her to take an extended sick leave. Rebecca was unmarried at this time and claims that she was living with Amanda and several cats in an apartment, a claim that John contests, arguing instead that she was sharing the apartment with a man.[1]

After his divorce from Rebecca, John continued to live in the house that he and Rebecca had occupied during their marriage. He also continued to work as a police officer in the Indianapolis Police Department. In October of 1985, he married his present wife, Lori.

In the late winter and early spring of 1986, the already strained relations between John and Rebecca worsened considerably. When the Isoms divorced in 1984, the court awarded John one day per week of visitation, which he enjoyed until December of 1985, when Rebecca's work schedule changed, making a change in the visitation schedule necessary. The parties agreed that instead of spending one day per week with Amanda, John would spend every other weekend with her, which would lengthen his visits with Amanda while at the same time making Rebecca's schedule more manageable. This arrangement continued until February 22, 1986 when John and Lori returned Amanda to Rebecca's parents after a weekend visit, as was their custom, and John informed Rebecca's father that he wanted to see Amanda the following weekend. When Rebecca's father replied that that would violate the arrangement that the parties had agreed to, John became angry and shouted at him in a threatening manner.

On March 10, 1986, Rebecca filed with the Child Protection Services Division of the Marion County Department of Public Welfare a charge of sexual molestation, asserting that she had discovered John and Amanda engaging in fellatio in a bathtub when Amanda was six months old. John denied that he had ever sexually abused Amanda. John was not permitted to see Amanda again until several weeks later, when the Department of Public Welfare had completed an investigation and con-

---

1.  Whether or not Rebecca shared an apartment at this time with a man, John's counsel is wholly unjustified in pointing out that the man with whom she was supposedly living is black. The race of any such man is immaterial to this court's decision to affirm or reverse John's motion for modification of custody. *See Palmore v. Sidoti* (1984), 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421. Moreover, in the present case there are no contentions such as those we con- sidered in *Marriage of Brown* (1985), Ind.App., 480 N.E.2d 246 which attempt to raise a genuine concern for the child. Counsel's insistence upon disclosing the racial identity of the alleged cohabitant can only be interpreted as a blatant appeal to racial prejudices that are anathema to this court and antithetical to the proper exercise of the judicial function. This court will not tolerate such conduct.

cluded that Rebecca's charges could not be substantiated.

On March 24, 1986, John responded to Rebecca's allegation by filing a motion for the modification of custody, arguing that Rebecca was emotionally unstable and that he was in a more favorable position than she was to provide a stable home for Amanda. On May 18, 1987, a hearing on John's motion began in Marion County Superior Court and the parties submitted a portion of the evidence. On August 3, 1987, the parties presented the remainder of their evidence and the hearing concluded. On August 7th, the court granted John's motion. Rebecca responded by filing a motion to correct errors on October 14th. After the trial court denied that motion, Rebecca filed this appeal.

### III. Discussion and Analysis

Rebecca's argument and our analysis of that argument is as follows:

The trial court abused its discretion in granting John's motion for the modification of custody because its decision was contrary to the weight of the evidence presented.

Rebecca contends that John has failed to carry his burden of demonstrating that the circumstances of Rebecca's life have undergone such a substantial and continuing change since she was awarded custody of Amanda that the custody order is no longer reasonable. *See Pea v. Pea* (1986), Ind. App., 498 N.E.2d 110. She acknowledges that she has moved from her parents' house to an apartment, has occasionally refused to allow John to see Amanda and that she once outfitted Amanda with a bagful of dirty clothes for a visit with John. She maintains that these incidents do not indicate that the circumstances of her life have changed so dramatically and unalterably as to render the original custody order unreasonable.

John counters that the trial court did not abuse its discretion in granting his motion for modification of custody because the evidence of changed circumstances and a concern for Amanda's best interest supports the court's decision. We agree.

Our analysis begins with a recognition that "[t]he overlying concern in any child custody determination is the best interest of the child. *Franklin v. Franklin* (1976), [169] Ind.App. [537], 349 N.E.2d 210." *Whitman v. Whitman* (1980), Ind.App., 405 N.E.2d 608, 610. That is, "[i]t is the child's welfare—not the parents'—that must control the actions of the court. *Wible v. Wible* (1964), 245 Ind. 235, 196 N.E.2d 571." *Pribush v. Roy* (1983), Ind. App., 456 N.E.2d 747, 750. That concern is reflected in the language of IC 31–1–11.5–22(d), the governing statute in this area. The statute states that a court may modify a child custody order only upon a showing of changed circumstances in the custodial home or in the treatment of the child in that home "so substantial and continuing as to make the existing custody order unreasonable."

In Indiana, "[a] decision to modify a custody decree rests in the sound discretion of the trial court. *Barnett v. Barnett* (1983), Ind.App., 447 N.E.2d 1172." *Pea*, supra at 113. "[T]he function of an appellate tribunal in an appeal from a custody modification decree [is] to determine whether the lower court's decision is clearly against the logic and effect of the facts and circumstances before the Court, a standard of review which necessarily requires this Court to look to the language and meaning of … IC 31–1–11.5–22(d), to determine whether the party seeking modification presented evidence on each element of his burden of proof." *Moutaw v. Moutaw* (1981), Ind.App., 420 N.E.2d 1294, 1295.

Accordingly, we have held that "[a] modification of custody is warranted only when the petitioner shows a decisive change in conditions in the custodial home, or a change in the treatment of the [child] in the custodial home which necessitates removal. *Gerber v. Gerber* (1985), Ind.App., 476 N.E. 2d 531; *Pribush v. Roy* (1983), Ind.App., 456 N.E.2d 747, *trans. denied.*" *Pea*, supra at 113. Even when the petitioner demonstrates such a change, "these changed circumstances will support a modification order only if such order is necessary for the welfare of the child, thereby conclusively establishing that the existing custody

order is unreasonable. *Poret v. Martin* (1982), Ind., 434 N.E.2d 885; *Pribush, supra.*" *Id.* "A modification of custody is not warranted if the evidence establishes only a change in the noncustodial parent's lifestyle." *Id.* at 115. Finally, modification is inappropriate unless the trial court first determines "not only that [the] changed circumstances are substantial, but that they are continuous. *Whitman, supra;* IC 31-1-11.5-22(d)." *Id.* at 113.

■ Applying these standards to the facts at hand, we determine that the evidence supports the trial court's granting of John's motion to transfer custody of Amanda from Rebecca to him. John has borne the burden of proving that in the years since the court awarded custody of Amanda to Rebecca, there have been changes in Rebecca's life that are sufficiently substantial and continuous as to render that custody award unreasonable today.

Specifically, John has introduced evidence that establishes that Rebecca suffers from Histrionic Personality Disorder, an affliction that causes her to view events and interpersonal relationships in a highly subjective manner, blame other persons for mutual misunderstandings, avoid coping with stressful circumstances and attempt to manipulate or misrepresent facts to her advantage. Dr. Robert Ten Eyck and Dr. John Ehrmann, clinical psychologists who each administered a standard psychological test known as the Minnesota Multi-Phasic Personality Inventory (MMPI) to Rebecca, both concluded after reviewing Rebecca's test results that she suffers from Histrionic Personality Disorder.

Dr. Ehrmann, who administered MMPI's to both John and Rebecca pursuant to court orders arising out of this litigation, testified that the results of those tests had led him to conclude that while John is not free of emotional difficulties, he is, nevertheless, a far more appropriate custodial parent for Amanda than Rebecca is. Dr. Ehrmann indicated that he had observed no habits in John that he feared would have a significant adverse effect upon Amanda and that he therefore would have no objection to an award of custody to John. Dr.

Ehrmann also indicated that he does fear that Rebecca's personality dysfunction will adversely affect Amanda in the future and that he therefore does not believe that Amanda should remain in Rebecca's custody.

Dr. Ehrmann's diagnosis, based on the results of the MMPI that he administered to Rebecca, is consistent with his testimony during the hearing on John's motion. According to that testimony, Amanda had informed Dr. Ehrmann during an office interview that Rebecca had instructed her to tell him that the bruises that Lori Isom had discovered on her buttocks had been inflicted by John and Lori.

Dr. Ehrmann's diagnosis is also consistent with the testimony of Kipp Wallace, whom Rebecca married shortly after her divorce from John. Wallace indicated that during his marriage to Rebecca, Rebecca had, on separate occasions, thrown a hot skillet at Amanda in anger, devised a plan to take Amanda to South America in order to prevent John from seeing Amanda, charged that John had anally raped her alongside a highway and charged that John had sexually molested Amanda in a bathtub. Wallace also indicated that when he attempted to initiate investigations regarding the charges of sexual misconduct against John, Rebecca became very angry with him, as if fearing that investigations would unearth her fabrications.

Dr. Ehrmann's diagnosis is also consistent with the testimony of polygraph examiner Steven R. Sims, who administered a polygraph test to Rebecca after she filed a child molestation charge against John with the Child Protection Services Division of the Marion County Department of Public Welfare. Mr. Sims testified that just prior to taking the test, Rebecca asked him: "What happens if I am not sure that I really saw this happen but I just told myself that it happened?" Mr. Sims subsequently testified that after examining the results of Rebecca's polygraph test, he had concluded that her responses to the test questions were not, on the whole, truthful.

Dr. Ehrmann's diagnosis is consistent, as well, with the deposition testimony of Dr.

Donald K. Leedy, a pediatrician who examined Amanda on November 6, 1986, several months after the Child Protection Services Division had concluded that the evidence failed to establish that John had sexually abused Amanda. Dr. Leedy testified that his examination of Amanda had yielded no evidence that anyone had molested her in any way.

Dr. Ehrmann's diagnosis is even partially consistent with the conclusions of Carol L. Radke, a counselor at the Domestic Relations Counseling Bureau of the Marion County Circuit and Superior Courts, whose October 27, 1986 report concerning Amanda stated that "[i]t appears that Amanda has been sexually abused." Ms. Radke is quick to acknowledge in her report that the evidence of abuse by no means establishes that John was the perpetrator. Moreover, that evidence consists of the unreliable allegations that Rebecca made to the Child Protection Services Division and the report of Dr. Roberta Hibbard of Riley Hospital, which based its conclusion that Amanda had been molested not on results obtained from a physical examination of the child, but on her frequent masturbation and apparent preoccupation with male and female genital organs. Ms. Radke concludes that while John *would be* an inappropriate custodial parent *if* he were the perpetrator of the sexual abuse alleged by Rebecca, Rebecca *is* an inappropriate custodial parent because her "personality profile and information obtained from therapists indicate that [she] is unstable...."

All of the above evidence indicates that Rebecca is suffering from a personality dysfunction that had not been diagnosed at the time of the original custody award and that renders her an inappropriate custodial parent of a young child. It also indicates that Amanda's best interest will be served by living with John and Lori. All indications are that John and Lori enjoy a happy marriage and a stable home, and that they are eager for Amanda to live with them. The only evidence that either John or Lori has other than an excellent relationship with Amanda comes from Rebecca's testimony.

Given this preponderance of evidence in John's favor, the trial court did not abuse its discretion in granting John's motion for modification of custody. In so finding, we again conclude, as we did several years ago in *Hoyle v. Hoyle* (1985), Ind.App., 473 N.E.2d 653, that where there is reliable evidence that one parent's emotional health is sound, while the other parent suffers from Histrionic Personality Disorder, a trial court does not abuse its discretion by awarding custody of the couple's child(ren) to the former. It is immaterial that in *Hoyle*, the trial court awarded custody to the unafflicted parent in the first instance whereas, in this case, the trial court did so on a motion for modification of custody. What is material is that, in both cases, the unafflicted parent has demonstrated that the afflicted parent is an inappropriate custodian of one or more minor children and that the best interests of those children will be served by a grant of custody to the unafflicted parent.

### IV. Conclusion

We conclude that the trial court acted properly in granting John Isom's motion for modification of child custody. Accordingly, we affirm the trial court's decision.

SHIELDS, P.J. and STATON, J., concur.