**Steven John MARKS,**
**Plaintiff–Appellee,**

v.

**CITY OF CHESAPEAKE, VIRGINIA, a municipal corporation; City Council of the City of Chesapeake, Virginia, in its official capacity; Sidney M. Oman; Willa Spruill Bazemore; John W. Butt; Walter Cartwright, Jr.; Cecil Y. Jenkins; J. Bennie Jennings, Jr.; John W. Keffer; Edward B. Speers; William E. Ward, in their official capacity as members of the City Council of the City of Chesapeake, Virginia, Defendants–Appellants.**

No. 88–1732.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1989.

Decided Aug. 24, 1989.

Henry Coke Morgan, Jr. (James B. Lonergan, Pender & Coward, Virginia Beach, Va., Ronald S. Hallman, City Atty., Chesapeake, Va., on brief), for defendants-appellants.

Andrew Michael Sacks (Michael F. Imprevento, Sacks & Sacks, Norfolk, Va., on brief), for plaintiff-appellee.

Before PHILLIPS and CHAPMAN, Circuit Judges, and WILLIAMS, United States District Judge for the Eastern

District of Virginia, sitting by designation.

PHILLIPS, Circuit Judge:

The City of Chesapeake, Virginia and various city officials appeal from a final judgment in favor of the plaintiff, Steven J. Marks, in this action under 42 U.S.C. § 1983. After a bench trial, the district court held that the Chesapeake City Council's denial of Marks' application for a "conditional use permit" to operate a palmistry within the city limits was "arbitrary and capricious," hence a deprivation of property without due process of law. Finding no reversible error, we affirm.

I

On April 29, 1982, Marks purchased a small house located inside the Chesapeake city limits. He intended to use the house for the operation of a palmistry and fortune telling business. At the time, however, the property was zoned only for residential uses. Marks therefore attempted to secure the City's approval for a zoning change.

Over the course of several years, the City had rezoned all property adjacent to the house for "commercial uses." In fact, the City's comprehensive development plan expressly contemplated future use of the entire surrounding area for business purposes. On May 6, 1982, Marks filed a formal zoning change request with the Chesapeake City Planning Commission, in which he sought reclassification of his property into the "B–2" ("general business") use category. The Commission unanimously approved Marks' request on June 9, 1982. Marks then sought final approval for the zoning change from the Chesapeake City Council. In a short oral presentation, Marks informed the Council that he intended to use the property for the operation of a palmistry and fortune telling business. No member of the public spoke in opposition to Marks' request, and the Council in turn unanimously approved the zoning change. Members of the Council expressly cautioned Marks, however, that

the City's licensing ordinance required that he obtain a "conditional use permit" for the operation of a palmistry.

Marks therefore returned to the Planning Commission with a permit application. On September 8, 1982, the Commission heard testimony from Marks' attorney, James Lewis, who noted that the City Council had already approved the necessary zoning change. The City's Planning Director, Milton Perry, then testified and informed the Commission that the Chesapeake zoning ordinance expressly permitted the operation of a palmistry on property zoned for "B–2" uses. He also stated that Marks' proposed use of the property "would not create a conflict or impact on the neighborhood." Again, no members of the public voiced opposition to Marks' request. After a short discussion, the Commission approved issuance of the permit, by a 6–3 vote.

Marks then returned to the City Council, seeking final approval of the permit. At a regularly scheduled meeting held on the evening of October 19, 1982, the Council took up several Planning Commission recommendations, including the Commission's preliminary approval of Marks' permit application. Then, during a "public comment" session, several local residents for the first time voiced their opposition to the proposed operation of a palmistry inside the city limits. Most apparently considered palmistry and fortune telling "unwholesome and immoral." More significantly, seven of the eight city residents speaking against Marks' application expressed "religious" reasons for their opposition to final approval of his proposed use of the property. One speaker claimed, for example, that "God told me to come down here and explain [this] to you all." He then read a passage from the Old Testament condemning "any one that maketh his son or his daughter to pass through the fire, or that useth divination, or an observer of times, or an enchanter, or a witch, or a charmer or a consulter with familiar spirits or a wizard, or a necromancer," [1] and concluded that "I'm opposed to [this application] be-

1. *Deuteronomy* 8:10–11 (King James).

cause God is opposed to it and I strongly request that you not [approve] the palmistry." [2]

Marks and his attorney argued in response that the zoning ordinance specifically contemplated the operation of palmistry and fortune telling businesses on property zoned for "B-2" commercial uses; that the Planning Commission had specifically found that Marks' palmistry business would "pose no adverse impact on the community"; and the "the [C]ity [C]ouncil should avoid basing its decision on religious grounds." They apparently were not persuasive. Without further discussion, the Council denied Marks' permit application unanimously.

Marks later filed this action under 42 U.S.C. § 1983, seeking injunctive and declaratory relief and compensatory and punitive damages. He claimed that the City's denial of his permit application was both "arbitrary" and "capricious," hence a deprivation of property without due process of law. Finding that "the issue raised is primarily one concerning the interpretation and application of a local zoning ordinance," however, the district court issued a *sua sponte* order temporarily abstaining from the decision of any federal claims pending Marks' exhaustion of any available state court remedies. *Marks v. City Council of the City of Chesapeake*, No. 83–286–N, slip op. at 2 (E.D.Va. July 25, 1984).

Marks then filed suit in the Virginia Circuit Court for the City of Chesapeake. After further proceedings which consumed more than two years, the state court dismissed the case, finding that under Virginia law a "City Council has wide discretion in the issuance of use permits," and that

Marks "failed to satisfy his burden of proof to establish that the actions of the City Council in this matter were clearly arbitrary and capricious." *Marks v. City of Chesapeake*, No. 22142 (Chancery), slip op. at 1 (5th Va.Circ.Ct. March 20th, 1987). Finally, in October of 1987, Marks returned to federal court, renewing his federal claim that the City Council's denial of his permit application constituted an unconstitutional deprivation of property without due process of law.

At this point, Marks no longer owned the subject property, leading the district court to dismiss as moot his claim for injunctive relief. The court reached the merits of the damages claim, however, and ultimately concluded that the City Council indeed *had* acted arbitrarily by denying Marks' permit application. Apparently discrediting some Council members' testimony that they had voted against approval of the application because the operation of a palmistry would "confine [this] valuable land's use to too limited a benefit," the court found that the City's officials had simply succumbed to "irrational neighborhood pressure" founded in religious prejudice. *Marks v. City Council of the City of Chesapeake*, No. 83–286–N, slip op. at 19 (E.D.Va. May 31, 1988). "[I]rrational, arbitrary governmental measures taken against a politically unpopular target on the basis of complaining neighbors' fears or negative attitudes are repugnant to constitutional guarantees." *Id.* Here, the danger of "validating [the] city council's decision to deny [the] permit" and thereby "endors[ing] unfavorable government action toward an unpopular segment of society" was "compounded" by

---

**2.** Most of first seven presentations were similar. One speaker argued, for example, that "God's word strongly condemns [palmistry and fortune telling] as an abomination to the Lord, both in the Old Testament and also in the New Testament. So being a Christian, and therefore being concerned about the moral fiber of our city, and basing my convictions on the Word of God, I register my opposition to this permit being granted." Another local resident claimed that palmistry was "witchcraft ..., black magic according to the Word of God[,] and I would not like to see, not only this come into the community and the great City of Chesapeake, but I fear

that should this be opened, we would be setting a precedent for other occult practices." *See* Joint Appendix at 993–95.

The eighth and final speaker made no reference to religion. Instead, he argued that Marks' business simply was not "desirable ... for a neighborhood." *Id.* at 996. In support of his presentation, this speaker presented a petition signed by approximately 170 citizens, all of whom had indicated their "protest [against] the granting of a use permit to operate a palm reading service" on Marks' property. *See id.* at 1006–17.

the apparent "influential power of religious dogma upon the council's discretion in deciding the ... issue." *Id.* at 21.

Marks had successfully established, therefore, that the Council's October 1982 deliberations were so tainted by impermissible "religious" considerations that its denial of his permit application was "arbitrary and capricious," hence a deprivation of property without due process. Finding that Marks' evidence of damages was far too "speculative," the district court awarded only nominal damages. Pursuant to 42 U.S.C. § 1988, however, the court also ordered the City to pay Marks' attorneys' fees and costs, which totalled some $7,000.

This appeal followed.

## II

There is in this case very little dispute about the applicable legal principles. The parties agree that "where there is fairly alleged a basis for finding either 'abuse of discretion [or] caprice in [a] zoning administrator's refusal to issue' a ... permit, a Fourteenth Amendment claim is properly stated." *Scott v. Greenville County,* 716 F.2d 1409, 1419 (4th Cir.1983) (quoting *United Land Corp. of America v. Clarke,* 613 F.2d 497, 501 (4th Cir.1980)). The dispositive question is whether "local officials ha[ve] ... singl[ed] out a permit applicant for adverse treatment due to 'illegitimate "political" or, at least, personal motives.' Such 'purposeful discrimination' against a particular individual ... violate[s] the Constitution *even where no recognized class-based or invidious discrimination was involved.*" *Id.* at 1420 (quoting *Cordeco De-*

*velopment Corp. v. Vasquez,* 539 F.2d 256, 260 (1st Cir.1976)) (emphasis supplied). As a general matter, therefore, the public's "negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases" for local officials' land use decisions. *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 448, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985).[3]

Whether in a given case the citizenry is said to be plagued by an "inaccurate" or "stereotypic" fear of the mentally retarded, *see J.W. v. City of Tacoma,* 720 F.2d 1126, 1131 (9th Cir.1983); *Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3258, women, *see Mississippi University for Women v. Hogan,* 458 U.S. 718, 723–30, 102 S.Ct. 3331, 3335–39, 73 L.Ed.2d 1090 (1982), the children of undocumented "aliens," *see Plyler v. Doe,* 457 U.S. 202, 218–20, 102 S.Ct. 2382, 2395–96, 72 L.Ed.2d 786 (1982), or, as alleged here, those who practice "rituals" thought by some to be heretical, the rule remains the same. Expressed in terms particularly relevant here, it is that government officials simply cannot act solely in "reliance on public distaste for certain activities, instead of on legislative determinations concerning public health and safety [or otherwise] dealing with zoning." *Bayou Landing, Ltd. v. Watts,* 563 F.2d 1172, 1175 (5th Cir.1977). Simply put, the dispositive principle is that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984).[4]

---

**3.** A Ninth Circuit panel summarized the relevant standards as follows:

Although a zoning classification or permit scheme is facially valid ..., it may not be applied in an unconstitutional fashion. Normally, the denial of a permit will be upheld unless arbitrary. The scope of federal court review of zoning decisions generally is extremely narrow. But ... constitutional concerns are heightened [where] the individual permit application decision may rest upon inaccurate and stereotypic fears.... In this situation, a court must look more carefully to determine whether the decision to deny a permit is related to [a] substantial state interest.... Unless it specifically serves such an

interest, the permit denial is arbitrary and violates due process.

*J.W. v. City of Tacoma,* 720 F.2d 1126, 1130–31 (9th Cir.1983) (citations omitted). Thus, "denial of [a] permit [is] arbitrary [where] the decision to deny was not related to any substantial zoning interest," but was instead motivated "principally [by] the heavy opposition of neighbors [expressed] at [a] public hearing." *Id.* at 1131–32.

**4.** Many of the cases cited above deal with equal protection challenges to legislative action. Because they "fit[ ] more broadly into a line of cases addressing the substantive unfairness of the process by which governmental actors de-

■ · We therefore think it clear that if, as alleged, the City Council denied Marks' permit application solely in an effort to placate those members of the public who expressed "religious" objections to the plaintiff's proposed use of his property, it thereby acted "arbitrarily" and "capriciously." That being the law, and as the City now all but concedes, the district court's only task was to resolve the parties' dispute over the Council's true "motivation" for acting as it did. This obviously required the court to resolve a factual question, and we therefore review its findings only for "clear error." *See Anderson v. Bessemer City,* 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

The defendants claimed at trial that the City Council refused to approve Marks' permit application not in response to public pressure, but instead because the Council members concluded, after evaluating certain "legitimate financial and commercial considerations," that "Marks' proposed use would not promote the property's highest economic use," and indeed "would confine the valuable land's use to too limited a benefit." *See* Appellant's Br. at 18; J.A. at 797. Of course, justified on these grounds, the Council's action would at least arguably have furthered a "legitimate governmental interest." In turn, it would perhaps have constituted a "permissible" exercise of the City's land-use planning authority. On this record, however, we simply cannot say that the district court "clearly erred" by refusing to accept this *post hoc* explanation for the ultimate decision on Marks' application—or by finding instead that the City Council's members indeed reacted "arbitrarily" to irrational pressure from local citizens.

The City's planning director, Milton Perry, testified at trial that "there would not [have] be[en] any adverse effect on the neighborhood with regard to Mr. Marks' proposed palmistry use," and that Marks' proposed use "conformed with the general plan and policies of the city in terms of land use." J.A. at 292. This the City does not dispute. Indeed, the defendants have never claimed that Marks' operation of a palmistry would have been inconsistent with the City's zoning ordinance or general land use plan. As indicated, they instead argued that Marks' proposal would simply have generated "too limited a benefit" in the surrounding area.

Two members of the City Council—Mayor Sidney Oman and Councilman Walter Cartwright—testified to that effect, but also explicitly conceded that the vocal opposition of several members of the local community ultimately influenced their votes. Oman testified that he was persuaded by citizens' views of the proposed business' "suitability for the neighborhood." "I listened to the people; I listened to the case, and eventually I came up with a vote." J.A. at 415. Counsel then asked whether "[y]our testimony is that [the] continual stream of people impressed you about the suitability [of the business]," to which Oman responded that "[i]t had an effect on my decision." *Id.* Cartwright testified similarly, here in response to direct questioning from the court:

THE COURT: [T]he real problem here is the question of how the community surrounding a particular area feels about a particular business?

[CARTWRIGHT]: I have to consider that in my thinking, Your Honor. I have taken the position that's one of the criteria that I should use. Now, right or wrong, that's the position I take.

[Q]: Well, does it make any difference who in the community complains?

[A]: Yes, sir.... I don't know that I would say that. It's the nature of the complaints—not the person, but the nature of the complaints—and the magnitude of the complaints—how many people.

*Id.* at 454–55. As indicated, Marks also offered into evidence the transcript of the meeting at which City Council considered and denied his application. Significantly, it includes no reference whatsoever to the "economic value" of Marks' proposal vis-a-

---

prive a citizen of a protected interest," however, these authorities are also—indeed especially—relevant where the dispositive question in a case is whether a local government's land use deci-

sion was "arbitrary and capricious," hence a deprivation of property without due process. *Scott,* 716 F.2d at 1420 n. 14.

vis other potential uses of the property. Indeed, the Council's members discussed not at all whether to grant the application—nor did they ask even one question as Marks and his neighbors debated the virtues and vices of palmistry and fortune telling.

What the transcript *does* reflect is the "nature of the complaints" voiced by those who opposed approval of the application. With but one exception, Marks' opponents offered "religious" reasons for withholding the permit—claiming, for example, that palmistry was "contrary to the Bible and what the Bible teaches." The necessary and obvious inference—given the Council members' explicit concessions at trial that they were in fact influenced by the public's expressions of concern—is that their deliberations were impermissibly tainted by "irrational neighborhood pressure" manifestly founded in religious prejudice. That said, we simply fail to perceive any "clear error" in the district court's ultimate conclusion that, by denying Marks' application, the Chesapeake City Council acted both arbitrarily and capriciously.

### III

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.