The CHURCH OF JESUS CHRIST OF
LATTER–DAY SAINTS, et
al., Plaintiffs,

v.

JEFFERSON COUNTY, ALABAMA, et
al., Defendants.

Civ. A. No. 89–AR–0711–S.

United States District Court,
N.D. Alabama, S.D.

Sept. 23, 1989.

Douglas P. Corretti, Mary D. Hawkins, James R. Scalco, Corretti & Newsom, Birmingham, Ala., for plaintiffs.

Jeffrey Monroe Sewell, Birmingham, Ala., for defendant Jefferson County, Ala.

Charles S. Wagner, Asst. County Atty., Birmingham, Ala., for all other defendants.

## MEMORANDUM OPINION

ACKER, District Judge.

This court has for consideration a motion to dismiss or, in the alternative, a motion for summary judgment filed by defendants, Jefferson County, Alabama; David Orange; Reuben Davis; Jim Gunter; John Katopodis; and Chris McNair. The individual defendants are members of the Jefferson County, Alabama, Commission, the governing body of Jefferson County, and are sued in their representative capacities. The court will consider this motion as one invoking Rule 56, F.R.Civ.P.

*Pertinent Undisputed Facts*

Plaintiffs Finley Eversole and Frieda Eversole own real property located in an unincorporated area of Jefferson County, Alabama. Plaintiff, The Church of Jesus Christ of Latter-Day Saints (herein "Church"), entered into a contract with the Eversoles to purchase their said property contingent on obtaining a zoning classification which will permit the construction of a worship facility. Plaintiffs Barry W. Seidel and Douglas Bennett are members of the Church. The Church wishes to construct and maintain a sanctuary and allied structures. The Eversoles' property is zoned E-1 (Estate Residential). Jefferson County's zoning ordinance does not allow churches to be constructed or maintained in an E-1 zone. Consequently, the Church and the Eversoles sought to have the property rezoned to a classification which would permit a place of worship.

Defendants concede that Jefferson County's zoning scheme permits churches only in an Institutional-1 (I-1) zoning district. In other words, to construct a church a property owner must either own property now located within an I-1 zone or have its classification changed to I-1. Defendants do not contradict plaintiffs' allegation that Jefferson County now contains no unoccupied property zoned I-1. Therefore, any proposed new church location in Jefferson County would necessitate a zoning change. (Complaint at 3). In compliance with the procedure provided by state law and the zoning ordinance, plaintiffs applied to the Jefferson County Planning and Zoning Commission to rezone this property. After a hearing, the Planning Commission unanimously recommended to the Commission that plaintiffs' application for rezoning be approved. The Commission then held its own public hearing on April 4, 1989, in accordance with required procedure. Rejecting the recommendation of the Planning Commission, the Commission denied plaintiffs' application for rezoning on a 3-2 vote.

After the Commission's action, plaintiffs filed their complaint in this court, invoking 42 U.S.C. § 1983. They allege the violation

of a panoply of constitutional rights under color of state law. Plaintiffs claim that both the zoning ordinance itself and the action by the Commission violate the following rights which are guaranteed by the United States Constitution: (1) equal protection of the law; (2) substantive due process; (3) free exercise of religion; and (4) just compensation and procedural due process upon a taking for public use. They append a state law claim invoking Alabama's constitutional prohibition against any action interfering with the free exercise of religion.

### Conclusions of Law

#### Jurisdiction

This court has jurisdiction of the federal questions under 28 U.S.C. §§ 1331 and 1343, and jurisdiction over the state claim as a matter of pendent jurisdiction.

#### Was There a Denial of Substantive "Due Process"? ·

Plaintiffs sue the Commission because these five men comprise the governing body of Jefferson County, and it was their 3–2 vote on April 4, 1989, which denied plaintiffs' application to rezone from E–1 to I–1. Plaintiffs expressly identify this vote as the only act by the individual defendants of which plaintiffs complain. (Complaint at 7–8). Plaintiffs characterize the vote of the majority as having been influenced by improper and illegitimate considerations. (Complaint at 7). The gravamen of the complaint is that the proposed zoning change was rejected by politicians out of political considerations. (Complaint at 7). Plaintiffs conspicuously do not claim corruption or venality.

When this action was filed, *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570 (11th Cir.1989), had not been decided by the Eleventh Circuit. *Greenbriar* was decided on September 1, 1989, after these defendants' motion for summary judgment was under submission. This court deliberately withheld deciding defendants' Rule 56 motion until *Greenbriar* was decided.

Strain as it may, this court can find no avenue for the Eversoles and the Church around *Greenbriar*, which clearly stands for the proposition that elected officials who vote on zoning requests can act for purely political reasons, because partisan, political decision-making, even by unknowledgeable, close-minded politicians fearful of harm more than political, is automatically deemed rational and, therefore, *cannot* be arbitrary and capricious unless it is the product of corruption, namely, the result of an outright bribe, as contrasted to some "legitimate" promise to deliver votes or some "legitimate" threat to withhold votes or to harass the politician "legitimately." In other words, after *Greenbriar*, a zoning decision is in all respects likened to a Congressional enactment which anyone knows can become binding law as the direct result of an intensive lobbying effort, or as the direct result of the political clout of a particular voting block, or as the direct result of exceedingly friendly relations engendered by heavy campaign contributions, or because an irate constituent spits on a Congressman's child, all without any prior public hearing, which in another context might be thought to comport with the concept of "due process." Although there are many decided cases which do describe "zoning" as a legislative matter, it has also been widely recognized by courts that "zoning" has a quasi-judicial aspect or component, because in all instances the "legislative" process by which "zoning" is accomplished provides a *procedure* to be followed, including a public "due process" hearing after adequate notice to those who may be affected. In this sense the zoning function is markedly different from the usual activities of the second branch of government. However, in view of *Greenbriar*, in the zoning context there is seemingly no limit to the quantity or the quality of pre-judgment by the deciders, or to the level of hostility by the deciders toward the proponents or opponents; or to the level of actual fear of reprisal by the deciders; or to the level of ignorance of the deciders, whether displayed or hidden during the decisional process. The only limitation seems to be that there be no forty pieces of silver. Whether the kinds of intimidation that affect decision-making to-

day in Colombia are legitimate in the three states comprising the Eleventh Circuit is, perhaps, still a matter for debate. Under the *Greenbriar* regime, the proponents and opponents to a zoning request will soon resemble the organized mob at Alabaster, and police protection for the deciders may become the order-of-the-day. Anything goes!

The *Greenbriar* rationale clearly takes away any and all causes of action which the Eversoles and the Church might have had pre-*Greenbriar* for an alleged denial of *substantive due process.* Compare *Marks v. City of Chesapeake,* 883 F.2d 308 (4th Cir.1989).

The adverse vote by the City Council of Alabaster in *Greenbriar* constituted a decision which the jury, after hearing all of the evidence and observing the demeanor of the witnesses, found to be "arbitrary and capricious." In all probability the jury reached this conclusion because the City Council voted (1) after *ex parte* meetings between the opponents, the Mayor and certain council members; (2) in an atmosphere of severe tension and intimidation as reflected in an awesome video tape shown to the jury (whether the tape was viewed by the Eleventh Circuit is not stated in its opinion); (3) without the City's complying with its own procedural rules and the rules mandated by the Code of Alabama (the Planning Commission, required by law to express an opinion, neither recommended for nor against the zoning change after its chairman, the Mayor, contrary to Roberts Rules, voted against it, creating a false tie); (4) with the Council members being totally ignorant of the intent, purpose and meaning of the very zoning classification which the developer there sought to have placed on its property; (5) after a written internal warning to the Council from the most knowledgeable City councilman that to deny this particular zoning request well might constitute an arbitrary and capricious act; and (6) without the City's having sought or obtained any expert advice on the effects, bad or good, of the proposed zoning change until after the suit was filed. The zoning applicant in *Greenbriar* presented to the jury what can only be described as close to a perfect case of irrational decision-making by the "legislative" body, that is, unless "rationality" has taken on a new meaning in the political context.

The Eversoles and the Church have not offered the kinds of proof offered by the developer in *Greenbriar.* Thus, under the combined lessons of *Greenbriar* and of *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), defendants are clearly entitled to summary judgment as to that aspect of this action charging a denial of substantive due process. The court understands that there is now pending a suggestion for rehearing *en banc* in *Greenbriar,* but this court is nevertheless bound by it.

## Was There a "Taking" Without the Payment of Just Compensation?

The Fourteenth Amendment siphoned and made applicable to the states the Fifth Amendment prohibition against the taking of private property by a governmental entity without the payment of just compensation and unless due process is afforded.

Although the *Greenbriar* court was not asked to deal with an allegation of a "taking," *Greenbriar* did pinpoint the probable reason why the developer in that case did not even allege a "taking." The Eleventh Circuit panel said:

> *A takings claim requires a showing that the challenged action has deprived an owner of all or substantially all economically beneficial use of his property.* See *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 107 S.Ct. 2378, 2389, 96 L.Ed.2d 250 (1987) (expressly limiting holding—that landowner may recover damages before final determination that regulation constitutes a taking—to situation where "the ordinance in question denied appellant all use of its property"); *id.,* 107 S.Ct. at 2393 (Stevens, J., dissenting) ("a regulatory program that adversely affects property values does not constitute a taking unless it destroys a major portion of the property's value ...

only the most extreme regulations can constitute takings."). *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631 (1978) (Mere diminution in value of property because of land use regulation does not by itself constitute a taking). Thus, a determination of precisely what use is permitted is of great relevance in ascertaining whether a taking has occurred. *Greenbriar*, 881 F.2d at 1576 (emphasis supplied).

■ In the instant case, plaintiffs have not offered any evidence of a differential in fair market value between the property as presently zoned and the property if zoned for institutional use, much less "that the unchallenged action has deprived [the Eversoles] of all or substantially all economically beneficial use of [their] property." Even if it is assumed *arguendo* that the purpose of the proposed zoning change is to increase the property value and thus to increase the Eversoles' profit when and if they sell the property to the Church, there is, and can be, no true comparison between this case and *First English Evangelical*. Here, ostensibly, the property, as now zoned, has substantial value and can be exploited economically. Thus, there has simply been no "taking," particularly when, as noted, if *Greenbriar* correctly states the law, it establishes beyond all doubt that these defendants were not "arbitrary and capricious."

It should also be kept in mind that the Eversoles, and not the Church, now own the property, so the Church and its members probably have no standing to complain of a "taking." If the Church has a protectable property interest in a "mere expectancy," the Church finds itself in the same empty boat as do the Eversoles.

■ Even if theoretically there could be a "taking" under the circumstances alleged here, any such claim is not yet "ripe," because *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), requires a property owner to seek legal redress through available state procedures before invoking 42 U.S.C. § 1983. The fact that the Supreme Court requires a state to provide a mechanism or remedy for a property owner to obtain "just compensation" for a "taking," creates a defense requiring exhaustion of that guaranteed remedy. *See East Bibb Twiggs Neighborhood v. Macon–Bibb Planning*, 662 F.Supp. 1465, 1468 (M.D.Ga.1987). The property owners have not pursued a state claim of inverse condemnation (necessarily assuming that one is available) and thus have not "exhausted."

The fact that this court expresses doubt about the ripeness of the Eversoles' "taking" claim does not mean that this court believes that the Eversoles can ever state or prove such a claim. Both *First English Evangelical* and *Greenbriar* stand squarely in their way. *See also Baytree of Inverrary Realty v. City of Lauderhill*, 873 F.2d 1407 (11th Cir.1989).

*Were Plaintiffs Denied "Equal Protection"?*

■ Plaintiffs have offered no proof that other applicants, either identically or similarly situated to plaintiffs, were treated differently by these defendants. For aught appearing, then, all applicants for the rezoning of property for the future construction and operation of a worship center on property presently zoned I–1, have been turned down just as plaintiffs were turned down. As stated in *Spence v. Zimmerman*, 873 F.2d 256 (11th Cir.1989), "The equal protection clause 'is essentially a direction that all persons similarly situated be treated alike.'" (citing *City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 434, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)). Assuming *arguendo* that some congregations or denominations might be able in the future to persuade their Jefferson County "legislators" to give them what is, in effect, a building permit, while other congregations or denominations might not be able so to persuade their "legislators," the adversely affected group will nevertheless run into the *Greenbriar* answer, which simply says, "THAT'S POLITICS!". Perhaps there is

an exception if, for instance, the Commission should prefer the Black Muslims over the Mormons, not as the consequence of the number of votes each group commands, but because the Commission should prefer one group's beliefs over the other's beliefs. It is difficult to tell whether *Spence v. Zimmerman* recognizes "undue political influence," whatever that is, as a basis for an "equal protection" claim. In *Spence,* the Eleventh Circuit recited the following citations of authority, assumedly in support of its holding on the "equal protection" issues:

> *Compare Cordeco Development Corp. v. Santiago Vasquez,* 539 F.2d 256 (1st Cir.1976) *(upholding equal protection violation when plaintiff accused defendants of failing to act on sand excavation permit but granting permits to politically influential family for excavation of five adjacent parcels) with Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54 (2d Cir.1985) (insufficient allegations of equal protection violation where junkyard operator alleged that zoning board wanted his application "killed" but did not allege that others were treated differently) *and Beacon Syracuse Associates v. City of Syracuse,* 560 F.Supp. 188, 199 (N.D.N.Y.1983) (dismissing equal protection claim for failure to allege manner in which plaintiff was treated differently from those similarly situated).

873 F.2d at 262 (emphasis supplied).

This Eleventh Circuit comment may not only be relevant to "equal protection," but it anticipates plaintiffs' last contention based on the First Amendment, discussed *infra.*

This court supposes, theoretically, that it would be possible for plaintiffs to present a fact situation which would form a basis for an "equal protection" claim, but plaintiffs here have not presented one, as they are required to do under *Celotex* in order to avoid a dismissal under Rule 56.

*Were Plaintiffs Denied the Free Exercise of Religion?*

■ The Fourteenth Amendment not only acts to prevent Jefferson County and its governing body from depriving a person of his rights to "due process" and to "equal protection," and prohibits a "taking" of his property without fair compensation and procedural due process, but it incorporates the First Amendment and guarantees his right to exercise his religion freely.

■ There is no indication in this record that the Eversoles are members of the Church or that they have any interest, other than economic, in the outcome of this case. Therefore, the Eversoles themselves have stated no claim of a First Amendment variety.

As to Church of Jesus Christ of Latter-Day Saints and its two individual representatives, the First Amendment question is one not controlled by *Greenbriar.* The "free exercise" question is a ticklish one, which may bleed over somewhat into "equal protection" and "due process." In *City of Chesapeake, supra,* the Fourth Circuit less than a month ago confronted a "legislative" decision which denied the use of land for a fortune telling business. All of the prerequisite administrative recommendations had here been favorable to the applicant. The opponents voiced religious objections. The "legislators" (City Council of the City of Chesapeake) unanimously denied the application. The Fourth Circuit agreed with its district court's finding that the Council had been arbitrary, and held:

> The court reached the merits of the damages claim, however, and ultimately concluded that the City Council indeed had acted arbitrarily by denying Marks' permit application. Apparently discrediting some Council members' testimony that they had voted against approval of the application because the operation of a palmistry would "confine [this] valuable land's use to too limited a benefit," the court found that *the City's officials had simply succumbed to "irrational neighborhood pressure" founded in religious prejudice. Marks v. City Council of the City of Chesapeake,* 723 F.Supp. 1155, 1163 (E.D.Va.1988). *"[I]rrational, arbitrary governmental measures taken against a politically unpopular target on the basis of complaining neighbors'*

*fears or negative attitudes are repugnant to constitutional guarantees."* Id. Here, the danger of "validating [the] city council's decision to deny [the] permit" and thereby "endors[ing] unfavorable government action toward an unpopular segment of society" was "compounded" by the apparent "influential power of religious dogma upon the council's discretion in deciding the ... issue." Id. at 21. Marks had successfully established, therefore, that the Council's October 1982 deliberations were so tainted by impermissible "religious" considerations that its denial of his permit application was "arbitrary and capricious," hence a deprivation of property without due process.

\*    \*    \*    \*    \*    \*

Expressed in terms particularly relevant here, it is that government officials simply cannot act solely in "reliance on public distaste for certain activities, instead of on legislative determination concerning public health and safety [or otherwise] dealing with zoning." *Bayou Landing, Ltd. v. Watts,* 563 F.2d 1172, 1175 (5th Cir.1977). Simply put, the dispositive principle is that "[p]rivate biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti,* 466 U.S. 429, 433 [104 S.Ct. 1879, 1882, 80 L.Ed.2d 421] (1984). We therefore think it clear that if, as alleged, the City Council denied Marks' permit application solely in an effort to placate those members of the public who expressed "religious" objections to the plaintiff's proposed use of his property, it thereby acted "arbitrarily" and "capriciously." That being the law, and as the City now all but concedes, the district court's only task was to resolve the parties' dispute over the Council's true "motivation" for acting as it did. This obviously required the court to resolve a factual question, and we therefore review its findings only for "clear error." See *Anderson v. Bessemer City,* 470 U.S. 564, 573–76 [105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518] (1985).

The defendants claimed at trial that the City Council refused to approve Marks' permit application not in response to public pressure, but instead because the Council members concluded, after evaluating certain "legitimate financial and commercial considerations," that "Marks' proposed use would not promote the property's highest economic use," and indeed "would confine the valuable land's use to too limited a benefit." See Appellant's Br. at 18; J.A. at 797. Of course, justified on these grounds, the Council's action would at least arguably have furthered a "legitimate governmental interest." In turn, it would perhaps have constituted a "permissible" exercise of the City's land use planning authority. On this record, however, we simply cannot say that the district court "clearly erred" by refusing to accept this post hoc explanation for the ultimate decision on Marks' application—or by finding instead that City Council's members indeed reacted "arbitrarily" to irrational pressure from local citizens.

*Id.* 883 F.2d at 310–312 (emphasis supplied).

Any similarity between the evidence in *City of Chesapeake* and in *Greenbriar* is purely deliberate. The appellate result is, of course, markedly dissimilar. The Fourth Circuit disagrees with the Eleventh, believing that the trier of fact can refuse to accept a *post hoc,* self-serving declaration of rationality. If *City of Chesapeake* cannot open the door closed by *Greenbriar* to a claim of denial of substantive due process, it does manage to provide reinforcement to the Church's First Amendment claim.

It is true that the Church offers no proof of any actual intent by any one of the three members of the Commission who voted against the Church to inhibit or to interfere with the exercise of the Mormon faith, or with the free exercise of religion generally, although it may well be true that the objecting, prospective residential neighbors were motivated to oppose the zoning change, at least to some extent, by an aversion they may have for this particular

religious group, and that they may not have had such an aversion if the new sanctuary had been intended to house a "nice" "mainline" congregation.

■ The Church does have standing to complain under the First Amendment as a "would-be" property owner, even though it does not yet have title. Defendants correctly do not contest the Church's *standing* on this issue.

■ Based on the foregoing, this court finds that there do exist disputes of material fact which preclude the grant of summary judgment as to that aspect of this action by the Church which invokes the First and Fourteenth Amendments under 42 U.S.C. § 1983. There needs to be considerably more factual development before this court can decide whether or not the Jefferson County zoning ordinance as it now exists, either facially or as here applied, constitutes an undue burden on church expansion and on the particular efforts of this Church and its members freely to exercise their religion in Jefferson County. The fact that under Jefferson County's zoning scheme *every* prospective new church location in Jefferson County potentially triggers a confrontation and a political battle may be such a heavy burden that the First and Fourteenth Amendments cannot tolerate it. The heaviness of that burden in this instance is something which must await the factfinder. It cannot be disposed of under Rule 56.

An appropriate, separate order will be entered.

DONE.