Aubrey E. HENRY, Plaintiff,

v.

**JEFFERSON COUNTY PLANNING COMM'N, et al., Defendants.**

Civil Action Nos. 396–CV–40, 399–CV–25.

United States District Court,
N.D. West Virginia,
Martinsburg Division.

June 26, 2001.

John C. Yoder, Yoder Law Offices, Harpers Ferry, WV, for Plaintiff.

Michael D. Lorensen, Charles F. Printz, Jr., Bowles, Rice, McDavid, Graff & Love, Martinsburg, WV, for Defendants.

*MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS RENEWED MOTION FOR SUMMARY JUDGMENT*

BROADWATER, District Judge.

For the reasons set forth below, the Court **GRANTS** the defendants' renewed motion for summary judgment.

## I. FACTS

### A. *Background.*

Aubrey E. Henry (Henry) and Kenneth F. Lowe, Jr. (Lowe) applied for conditional use permits at different times and for properties zoned in different Zoning Districts. Henry's application was denied. However, Lowe's application was granted. Consequently, Henry filed suit.

The events in this civil action span over six years. They arise out of the following procedural framework for obtaining a conditional use permit, as set forth by the Zoning and Development Review Ordinance of Jefferson County, West Virginia (Ordinance), and procedures of appellate review, as set forth by the West Virginia Code.

### 1. *Procedure for Obtaining a Conditional Use Permit.*

The Ordinance sets forth five steps in reviewing an application for a conditional use permit: (1) the Planning and Zoning Staff evaluation of the Development Review System;[1] (2) the Compatibility Assessment Meeting;[2] (3) Public Hearings;[3] (4) Planning and Zoning Commission's decision on the application;[4] and (5) the Board of Zoning Appeal's decision.[5]

### 2. *Procedure of Appellate Review.*

The West Virginia Code provides for two levels of appellate review. First, an aggrieved party may file a petition for certiorari from the Board of Zoning Appeals (Board) to the Circuit Court of the County in which the property is located.[6] Second, an aggrieved party may file a petition for certiorari from the Circuit Court to the West Virginia Supreme Court of Appeals.[7]

### B. *The Town Run Property and Maddex Court.*

Henry is the part owner of the Town Run Property located in Jefferson County, West Virginia.[8] For approximately twenty years, Henry operated a restaurant on the Town Run Property.[9] Under the Ordinance, the Town Run Property was located

1. Ordinance § 7.3(b)(2).

2. *Id.* § 7.3(b)(3).

3. *Id.* § 7.3(b)(4).

4. *Id.* § 7.3(b)(5).

5. *Id.* § 7.3(b)(6).

6. W. VA.CODE § 8–24–59 (1998).

7. *Id.* § 8–24–65.

8. Pl.'s Ex. A.

9. Dep. of Henry, pp. 16–18.

in a "Rural–Agricultural District",[10] and the restaurant operated as a non-conforming use.[11]

In addition to his ownership interest in the restaurant, Henry had an ownership interest in other properties, including the Maddex Court.[12] The Maddex Court is a forty-four unit apartment complex also located in Jefferson County, West Virginia.[13] This apartment complex is for tenants with low to moderate income levels.[14]

In February 1993, Henry's restaurant burned down.[15] Under the Ordinance, Henry was required to submit a formal proposal with the Planning and Zoning Commission (Commission) to rebuild his restaurant.[16] Henry did not submit such a proposal. Instead, he submitted a proposal to build seventy-six townhouses.[17]

## C. Henry's Application for a Conditional Use Permit.

In order for Henry to build the townhouses, he had to either (1) petition the Jefferson County Commission to rezone the property on which he planned to build the townhouses[18] or (2) apply for a conditional use permit.[19] On January 25, 1994, Henry applied for a conditional use permit.[20]

### 1. The First Step: Planning and Zoning Staff Evaluation of the Development Review System.

The Development Review System is a method to "assess a particular sites[sic] development potential based on criteria which determine the agricultural longevity of the parcel in combination with the presence of and compatibility with public services adjacent and in close proximity to the site."[21] Under the Development Review System,[22] the Planning And Zoning Staff scored the site on which Henry planned to build the townhouses a 39.04.[23] Consequently, his application proceeded to the next stage: the Compatibility Assessment Meeting.[24]

### 2. The Second Step: The Compatibility Assessment Meeting.

The Compatibility Assessment Meeting "allows the adjacent and confronting property owners and all other interested parties the opportunity to hear the developer's presentation and plan."[25] On March 23, 1994, the Commission conducted the Compatibility Assessment Meeting.[26] Henry attended this meeting. At this meeting, the community expressed opposition to Henry's plan to build townhouses.

10. Ordinance § 5.7.

11. Id. § 4.3. Henry operated the restaurant prior to the effective date of the Ordinance, id. § 1.0. The Ordinance, however, expressly permitted the continued use of the restaurant as a non-conforming use, id. § 4.3.

12. Dep. of Henry, p. 18.

13. Id. at p. 19.

14. Id. at p. 33–36.

15. Id. at p. 125.

16. Ordinance § 4.3(c).

17. Pl.'s Ex. A.

18. W. Va.Code § 8–24–46 (1998).

19. Ordinance § 6.1.

20. Pl.'s Ex. A.

21. Ordinance § 6.1.

22. Id. art. VI.

23. Pl.'s Ex. B, p. 8.

24. Ordinance § 6.2.

25. Id. § 7.6.

26. Pl.'s Ex. C, p. 1.

Specifically, the community members raised twenty-five concerns regarding the incompatibility of these townhouses to their surroundings. At the close of the meeting, Henry agreed to resolve five of these compatibility issues. Therefore, sixteen compatibility issues remained unresolved. These sixteen conditions were:

1. Erect an 8 foot fence along the Men's Club property line (the park);

2. Provide stormwater management for the 25 year storm;

3. Provide the amount of volume and depth increases in Town Run accounted to stormwater management and effluent discharge;

4. Notify Department of Environmental Protection the result of number three as a part of their waste load allocation;

5. Provide yearly monetary donation to Morgan Grove Park;

6. Provide a note on plat and disclosure to buyers that identifies the more intense uses associated with the park;

7. Reduce the density to no more than 1 unit per acre;

8. Do a cost analysis and feasibility study on hooking up to Shepherdstown sewer;

9. Provide a 100 foot building setback along southern property line;

10. Notify the West Virginia Department of Culture and History of this development and allow them to consider its impact;

11. Do a scientific study on the effect of an inoperable package treatment plant on the Marsh and Town Run;

12. Do a traffic study to be submitted and approved by the Department of Transportation;

13. Provide an unscalable fence between the Marsh and development;

14. Provide an area for resident animals to defecate;

15. Provide school impact fees in the amount of $1500.00 per unit prior to house construction; and

16. Conduct a bio-assessment study on the impact of the approved waste load allocation on the marsh.[27]

### 3. *The Third Step: Public Hearings.*

The Public Hearing is a forum "to hear the staff's report of the issues and concerns raised at the Compatibility Meeting."[28] Because these sixteen compatibility issues remained unresolved at the conclusion of the March 23, 1994 Compatibility Assessment Meeting, the Commission held a Public Hearing on April 26, 1994. At the conclusion of this Public Hearing, the compatibility issues still remained unresolved. The Commission, therefore, continued the hearing until May 24, 1994.[29]

At this second Public Hearing, the public continued to address their concerns regarding the incompatibility of these townhouses to their surroundings.[30] The Ordinance provided Henry with a right to rebut the public's concerns.[31] Henry, however, did not offer any response.[32]

### 4. *The Fourth Step: The Planning and Zoning Commission's Decision on the Application.*

At the conclusion of the May 24, 1994 Public Hearing, the Commission, by unani-

---

27. *Id.* at pp. 1–2.

28. Ordinance § 7.6(e).

29. Pl.'s Ex. D, p. 3.

30. Pl.'s Ex. E, pp. 1–2.

31. Ordinance § 7.7(c).

32. Pl.'s Ex. E, p. 2.

mous vote, denied Henry's application for a conditional use permit. In page two of the Commission's minutes, the Commission stated the following as grounds for its decision to deny Henry's application: "density, the projects[sic] danger to the Town Run and Morgan Grove Park and the incompatibility of the project with the neighborhood." [33]

### 5. The Fifth Step: The Board of Zoning Appeal's Decision.

The Board, among other duties,[34] "[h]ear[s] and decide[s] appeals regarding the Planning and Zoning Commission's issuance or denial of a Conditional Use Permit." [35] Henry appealed the Commission's decision to the Board.[36] On August 18, 1994, the Board of upheld the Commission. By letter dated August 26, 1994, the Board determined that the basis of the Commission's "decision was the projects[sic] density; its effects on the Town Run Marsh and Morgan Grove Park; and, its incompatibility with the neighborhood." [37]

### D. Henry's Appeals to the West Virginia State Courts.

#### 1. The First Appeal.

Henry filed a petition for certiorari to the Circuit Court of Jefferson County.[38] By Order entered January 16, 1996, the Circuit Court affirmed the Board's decision.[39] In response, Henry filed an appeal to the West Virginia Supreme Court of Appeals.

By Opinion decided November 21, 1997, the West Virginia Supreme Court of Appeals determined that the Board's decision was not supported by adequate findings of fact. Consequently, the West Virginia Supreme Court of Appeals remanded the matter to the Board.[40]

Following remand, the Board issued a seven page decision and order entered February 19, 1998. This decision and order set forth findings of fact and conclusions of law in support of the Board's decision to uphold the Commission's denial of Henry's application for a conditional use permit.[41]

#### 2. The Second Appeal.

Henry filed a second petition for certiorari dated April 16, 1998 with the Circuit Court.[42] However, on August 27, 1999, the Circuit Court affirmed the Board.[43] In response, Henry filed a second appeal to the West Virginia Supreme Court of Appeals. By Order entered March 8, 2000, the West Virginia Supreme Court of Appeals denied Henry's appeal.[44]

### E. The Lowe Project and this Federal Lawsuit.

Two pertinent events occurred while Henry's first appeal was pending before the West Virginia Supreme Court of Ap-

---

33. Id.

34. Ordinance § 7.8(b)(2)-(3).

35. Id. § 7.8(b)(1).

36. Defs.' Ex. 8.

37. Pl.'s Ex. E.

38. W. VA.CODE § 8–24059 (1988); Ordinance § 8.3(b).

39. Defs.' Renewed Mot. Summ. J., Ex. J.

40. Henry v. Jefferson County Planning Comm'n, 201 W.Va. 289, 496 S.E.2d 239, 242 (1997).

41. Defs.' Ex. 10.

42. Defs.' Ex. 11.

43. Defs.' Ex. 13.

44. Defs.' Ex. 14.

peals. First, Lowe applied for a conditional use permit for the development of the Eastern Management Development Center (Lowe Project).[45] In contrast to the property on which Henry planned to build the seventy-six townhouses, which the Ordinance zoned as a "Rural–Agricultural District",[46] the Ordinance zoned the property on which Lowe planned to develop the Lowe Project as a "Residential–Growth District." [47]

Following the Planning and Zoning Staff evaluation of the Development Review System,[48] the Commission held the Compatibility Assessment Meeting on July 31, 1996.[49] At the meeting, in contrast to Henry's Compatibility Assessment Meeting of March 23, 1994, Lowe agreed to resolve all of the public's concerns. Therefore, unlike Henry, there were no unresolved issues at the conclusion of the Compatibility Assessment Meeting. Consequently, the Commission did not schedule a Public Hearing[50] and, instead, scheduled the matter for a decision.[51] On August 13, 1996, the Commission granted Lowe's application for a conditional use permit for the Lowe Project.[52] This would become known as the Clarion Hotel and Conference Center in Shepherdstown, West Virginia.[53]

Second, Henry filed a civil action in this Court on May 24, 1996 (*Henry I*) [54] suing the Commission [55] as well as its individual members [56] and the Director of the Commission.[57] Henry argued that the denial of his conditional use permit and the foreclosure of the option of rebuilding his burned down restaurant amounted to an unconstitutional taking [58] and a violation of his rights under the due process clause.[59] Henry also asserted that the Ordinance was unconstitutional.[60]

## II. PROCEDURAL BACKGROUND

### A. Amended Complaint.

By Orders entered November 22, 1996 [61] and June 20, 1997,[62] the Court stayed *Henry I* pending Henry's first appeal to the West Virginia Supreme Court of Appeals. After the West Virginia Supreme Court of Appeals' Opinion decided November 21, 1997, this Court held a status conference on January 6, 1998.[63] During this status conference, the Court granted Henry's motion to amend the complaint.[64]

45. Pl.'s Ex. I.

46. Ordinance § 5.7.

47. *Id.* § 5.4; Pl.'s Ex. K.

48. Ordinance § 7.3(b)(2).

49. *Id.* § 7.3(b)(3); Pl.'s Ex. J.

50. Ordinance § 7.3(b)(4).

51. *Id.* § 7.6(f).

52. Pl.'s Ex. K.

53. Pl.'s Ex. J.

54. *Henry v. Jefferson County Planning Comm'n,* 3:1996cv40.

55. Compl. ¶ 6.

56. *Id.* ¶¶ 7–14.

57. *Id.* ¶ 16.

58. *Id.* ¶¶ 37–42.

59. *Id.* ¶¶ 43–47.

60. *Id.* ¶¶ 47–50.

61. Doc. # 13.

62. Doc. # 14.

63. Doc. # 15.

64. Doc. # 16.

On January 23, 1998, Henry filed his amended complaint[65] based upon, *inter alia*, the Commission's decision to grant Lowe's application for a conditional use permit for the Lowe Project. In his amended complaint, Henry sued the following defendants: (1) Jefferson County,[66] (2) the Board,[67] (3) the Commission,[68] (4) the individual members of the Commission,[69] and (5) the Director of the Commission.[70] As well, Henry asserted five causes of action: (1) unconstitutional taking,[71] (2) due process,[72] (3) equal protection (rational basis),[73] (4) equal protection (suspect classification),[74] and (5) unconstitutionality of the Ordinance.[75]

### B. *Order on Motion to Dismiss.*

By Order entered September 24, 1998, the Court dismissed all of Henry's causes of action except his fifth cause of action challenging the constitutionality of the Ordinance.[76]

### C. *Henry II.*

On March 23, 1999, Henry filed a second civil action (*Henry II*) in this Court.[77] This civil action was the same in all material respects as *Henry I*. However, in *Henry II*, Henry included the State of West Virginia as a defendant.[78] As well, in *Henry II*, the Lowe Project was complete and in operation as the Clarion Hotel and Conference Center in Shepherdstown, West Virginia.[79] Furthermore, Henry brought two additional causes of action challenging the constitutionality of West Virginia Code § 8–24–60.[80]

### D. *Order on Motion for Summary Judgment.*

By Order entered July 21, 1999, the Court Granted defendants' motion for summary judgment with respect to the fifth claim in *Henry I*, challenging the constitutionality of the Ordinance, and dismissed the matter from the active docket of the Court.[81]

### E. *Fourth Circuit Court of Appeals.*

Henry filed an appeal with the Fourth Circuit Court of Appeals.[82] By Opinion decided June 9, 2000, the Fourth Circuit vacated this Court's September 24, 1998 Order on the defendants' motion to dismiss and upheld this Court's July 21, 1999 Order on the defendants' motion for summary judgment in *Henry I*.[83] Accordingly,

---

65. Doc. # 17.

66. Am. Compl. ¶ 6.

67. *Id.* ¶ 7.

68. *Id.* ¶ 8.

69. *Id.* ¶¶ 9–16.

70. *Id.* ¶ 17.

71. *Id.* ¶¶ 58–63.

72. *Id.* ¶¶ 64–68.

73. *Id.* ¶¶ 69–82.

74. *Id.* ¶¶ 83–95.

75. *Id.* ¶¶ 96–104.

76. Doc. # 31. The parties did not address the implicit overruling of *Pomponio v. Fauquier County Bd. of Supervisors*, 21 F.3d 1319 (4th Cir.1994), at that time.

77. *Henry v. West Virginia*, 3:1999cv25.

78. Compl. ¶ 6.

79. *Id.* ¶ 49.

80. *Id.* ¶¶ 63–76.

81. Doc. # 44.

82. Doc. # 46.

83. *Henry v. Jefferson County Planning Comm'n*, No. 99–2122, 2000 WL 742188 (4th Cir. Jun 9, 2000).

the Fourth Circuit remanded the matter to this Court to proceed upon Henry's first four causes of action.

### F. Dismissal and Consolidation Following Remand.

Following remand, the Court held a status conference on September 1, 2000.[84] During the status conference, the Court, without objection, dismissed Henry's claims challenging the constitutionality of West Virginia Code § 8–24–60 in *Henry II.* Accordingly, the Court dismissed the State of West Virginia as a defendant. Furthermore, the Court consolidated both *Henry I* and *Henry II.*[85]

### G. Remaining Causes of Action.

Therefore, the following claims remain before the Court for consideration: (1) unconstitutional taking, (2) due process, (3) equal protection (rational basis), and (4) equal protection (suspect classification). Furthermore, the following defendants remain in this civil action: (1) Jefferson County, (2) the Commission, (3) the Board, (4) the individual members of the Commission, and (5) the Director of the Commission.

### H. Renewed Motions for Summary Judgment.

On January 29, 2001, the defendants filed their renewed motions for summary judgment.[86] Henry filed his response on February 15, 2001[87] and on February 27, 2001, defendants filed their reply.[88]

On March 5, 2001, the parties appeared for a motions hearing.[89] The Court took the issues under advisement.[90]

Thereafter, by Order entered April 20, 2001,[91] the Court granted the individual defendants' motion for summary judgment finding that they were entitled to qualified immunity for their acts and/or omissions under *Harlow v. Fitzgerald.*[92] Therefore, the following defendants now remain in this civil action: (1) Jefferson County, (2) the Commission, and (3) the Board.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[93] This requires the Court to conduct "the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[94]

The party opposing summary judgment "must do more than simply show that

---

84. Doc. # 52.

85. Doc. # 53.

86. Docs. ## 86 & 88.

87. Doc. # 92.

88. Doc. # 101.

89. Doc. # 77.

90. Doc. # 105.

91. Doc. # 134.

92. 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

93. FED.R.CIV.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

94. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

there is some metaphysical doubt as to the material facts."[95] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[96]

## IV. DISCUSSION OF LAW AND ANALYSIS

### A. First Cause of Action: Takings Claim.

#### 1. Plaintiff's Argument.

Henry alleges that the defendants violated his rights under the Takings Clause of the Constitution by first, foreclosing his option of rebuilding his restaurant after it burned down and second, by denying his application for a conditional use permit.

#### 2. Discussion of Law.

The Takings Clause of the United States Constitution, applicable to the States via the Fourteenth Amendment,[97] prohibits the taking of private property without just compensation.[98] "The aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "[99]

In *Lucas v. South Carolina Coastal Council,*[100] the United States Supreme Court set forth two discrete categories of state action that violate the Takings Clause.[101] The first category is state action that physically invades private property.[102] The second category is state action that denies all economically beneficial use of property.[103]

Additionally, the Supreme Court provided two factors to determine whether state action violates the Takings Clause. The first factor is the extent to which state action interferes with reasonable investment-backed expectations.[104] The second factor is whether the regulation advances a legitimate state interest.[105]

#### 3. Analysis.

■ Henry has not provided any evidence that Raco, the Director of the Com-

---

**95.** *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**96.** *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (citations omitted).

**97.** *Chicago, B & Q.R. Co. v. Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

**98.** U.S. CONST. amend. V.

**99.** *Eastern Enters. v. Apfel,* 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

**100.** 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

**101.** *Id.* at 1015, 112 S.Ct. 2886 ("We have, however, described at least two discrete categories of regulatory action as compensable without case-specific inquiry into the public interest advanced in support of the restraint.").

**102.** *Id.* ("The first encompasses regulations that compel the property owner to suffer a physical 'invasion' of his property.").

**103.** *Id.* ("The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land.").

**104.** *Id.* at 1019, n. 8, 112 S.Ct. 2886 ("[A]s we have acknowledged time and again, '[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally.") (quoting *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

**105.** *Id.* at 1023–24, 112 S.Ct. 2886; *see also Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Corp.,* 65 F.3d 1113, 1123 (4th Cir.1995). *See generally* 31 AM.JUR.3D *Proof of Facts* § 563 (1995 & Supp.2000).

mission, prohibited Henry from rebuilding his restaurant. On the contrary, in Raco's deposition dated November 27, 2000, Raco informed Henry that, because the Ordinance classified the restaurant as a non-conforming use, Henry could not rebuild the restaurant as-of-right.[106] Furthermore, in his response to discovery requests, Henry stated that "Raco told plaintiff that the rebuilt restaurant ... would most likely not be approved, and that it would be easier to get approval of the townhouses than the restaurant".[107] Consequently, Raco simply advised Henry of the Ordinance's effect as it applied to Henry. Raco did not foreclose the option of rebuilding the restaurant.

Furthermore, there is no dispute that the defendants did not physically invade Henry's property.[108] As well, the defendants' actions, in allegedly foreclosing the option of rebuilding the restaurant and denying Henry's application for a conditional use permit, did not deny Henry of all economical use of the Town Run Property.[109] On the contrary, the Ordinance expressly permits Henry to operate a farm,[110] single family dwellings, mobile homes,[111] markets for the sale of farm products[112] and other uses.[113] Therefore, the defendants' actions did not deprive Henry all economical use of the Town Run Property.

Additionally, Henry cannot argue that the alleged foreclosure of his option of rebuilding his restaurant and the denial of his application or a conditional use permit interfered with his reasonable investment-backed expectations.[114] As previously mentioned, Henry has not provided any evidence that Raco foreclosed his option of rebuilding his restaurant.[115] Furthermore, Henry cannot reasonably expect that the Commission would automatically grant his application for a conditional use permit.[116] Therefore, the Henry's Takings claim focuses on whether the sixteen conditions

---

**106.** A. Mr. Henry was taking about the restaurant that burned down that occupied that occupied that site.

. . . .

Q. Did he inquire of you as to whether he could rebuild the restaurant? Do you recall?
A. Yes.
Q. Did you respond to him in any way in response to that inquiry?
A. Yes.
Q. What did you tell him?
A. I told him that it was my interpretation of the ordinance that he could not rebuild it, by right, since it was a non-conforming use, but he could attempt to ask the Zoning Board of Appeals to rebuild it. I even hold him four examples of non-conforming uses that were burned down that the Zoning Board did grant the right to rebuild, but in my opinion, he had to go to the Zoning Board, not to me.
Dep. of Raco, pp. 19–20.

**107.** Pl.'s Resp. to First Set of Interrogs. and Req. for Production of Docs. to the Pl., pp. 2–3.

**108.** See supra note 102.

**109.** See supra note 103.

**110.** Ordinance § 5.7(a)(1).

**111.** Id. § 5.7(a)(3).

**112.** Id. § 5.7(a)(11).

**113.** Id. § 5.7(a)(2), (4)-(10), (12)-(16).

**114.** See supra note 104.

**115.** See supra notes 106–07 and accompanying text.

**116.** See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005–06, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'") (quoting Webb's Fabulous Pharms., Inc. v. Beckwith, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)); see also infra notes 175–96.

advance a legitimate state interest.[117]

The sixteen conditions all advance legitimate state interests. The stated purposes of the Ordinance are to:

(a) Protect and encourage the health, safety and general welfare of the present and future population of Jefferson County.

(b) Help guide the future growth and development of Jefferson County in accordance with the adopted Comprehensive Plan.

(c) Encourage growth and development in areas where sewer, water, schools, and other public facilities are or will soon be available in order to provide services in the most cost effective manner.

(d) Insure that growth and development are both economically and environmentally sound.

(e) Encourage the maintenance of an agricultural base in the County at a level sufficient to insure the continued viability of farming.

(f) Encourage and support commercial, industrial and agricultural activities while maintaining land use, order and compatibility.

(g) Encourage an improved appearance of Jefferson County with relationship to the use and development of land and structures.

(h) Encourage the conservation of natural resources.

(i) Provide a guide for public action in the orderly and efficient provision of public facilities and services.

(j) Provide a guide for private enterprise in developing and building a strong economic community.

(k) Encourage historic preservation.[118]

Conditions 1,[119] 5[120] and 9[121] advance the stated purpose of promoting the general welfare.[122] Conditions 2,[123] 3,[124] 4,[125] and 13[126] advance the Ordinance's stated purpose of ensuring that development remains environmentally sound.[127] Conditions 6,[128] 7[129] and 12[130] advance the Ordinance's stated purpose of promoting the County's agricultural base.[131] Conditions 8,[132] 11,[133]

117. *See supra* note 105.

118. Ordinance § 1.1.

119. Erect an 8 foot fence along the Men's Club property line (the park).

120. Provide yearly monetary donation to Morgan Grove Park.

121. Provide a 100 foot building setback along southern property line.

122. Ordinance 1.1(a).

123. Provide stormwater management for the 25 year storm.

124. Provide the amount of volume and depth increases in Town Run accounted to stormwater management and effluent discharge.

125. Notify Department of Environmental Protection the result of number three as a part of their waste load allocation.

126. Provide an unscalable fence between the Marsh and development.

127. Ordinance § 1.1(d).

128. Provide a note on plat and disclosure to buyers that identifies the more intense uses associated with the park.

129. Reduce the density to no more than 1 unit per acre.

130. Do a traffic study to be submitted and approved by the Department of Transportation.

131. Ordinance § 1.1(e).

132. Do a cost analysis and feasibility study on hooking up to Shepherdstown sewer.

133. Do a scientific study on the effect of an inoperable package treatment plant on the Marsh and Town Run.

15,[134] and 16[135] advance the Ordinance's stated purpose of encouraging growth in areas where public facilities would be utilized in the most cost effective manner.[136] Condition 10[137] advances the Ordinance's stated purpose of encouraging historic preservation.[138] Condition 14[139] advances the Ordinance's stated purpose of promoting health.[140] Finally, the Ordinance's stated purposes advance the objectives of planing and zoning as set forth in the West Virginia Code.[141] Consequently, all sixteen conditions advance the different legitimate stated purposes of the Ordinance.

### 4. Conclusion.

Therefore, the Court **DISMISSES** plaintiff's Takings claim.[142]

### B. Second Cause of Action: Substantive Due Process.[143]

#### 1. Plaintiff's Argument.

Henry argues that the defendants violated his rights under the Due Process

---

**134.** Provide school impact fees in the amount of $1500.00 per unit prior to house construction.

**135.** Conduct a bio-assessment study on the impact of the approved waste load allocation on the marsh.

**136.** Ordinance § 1.1(c).

**137.** Notify the West Virginia Department of Culture and History of this development and allow them to consider its impact.

**138.** Ordinance § 1.1(k).

**139.** Provide an area for resident animals to defecate.

**140.** Ordinance § 1.1(a).

**141.** W. VA.CODE §§ 8–24–1 & 8–24–39 (1998).

**142.** Henry also argues that the imposition of the sixteen conditions violated the Takings Clause because there was no rough proportionality as between these conditions and the impact of the townhouses. This argument is without merit.

In *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), the Supreme Court addressed the degree of relationship that must exist as between the condition upon a development permit, in the form of the developer dedicating land to the city, and the impact that development may have upon the community, *id.* at 388, 114 S.Ct. 2309. The Supreme Court addressed the different approaches adopted by various jurisdictions, *id.* at 388–91, 114 S.Ct. 2309. Ultimately, the Supreme Court concluded that the proper test is the "rough proportionality"

test, *id.* at 391, 114 S.Ct. 2309. The Supreme Court concluded that this test does not require "precise mathematical calculation[s]." *id.* at 391, 114 S.Ct. 2309. On the contrary, the Supreme Court concluded that this test requires an "individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development." *id.* (footnote omitted).

Subsequently, in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999), the Supreme Court expressly limited the *Dolan* "rough proportionality" test to the limited context of exactions, *id.* at 702, 119 S.Ct. 1624 ("[W]e have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use."). Therefore, the Supreme Court did not apply the "rough proportionality" test to the denial of a development proposal, *id* . at 703, 119 S.Ct. 1624.

In this case, none of the sixteen conditions require Henry to dedicate portions of the Town Run Property for public use. Therefore, Henry's arguments concerning the alleged lack of rough proportionality are without merit.

**143.** Henry's complaint in *Henry I* included both a substantive, Compl. ¶¶ 45–46, and procedural due process claim, *id.* ¶ 47. However, in the Amended Complaint in *Henry I,* Am. Compl. ¶¶ 66–68, and the Complaint in *Henry II,* Compl. ¶¶ 85–87, Henry withdrew his procedural due process claim and proceeded only on a substantive due process claim.

Clause of the Fifth and Fourteenth Amendments by denying his application for a conditional use permit. Specifically, Henry alleges that the defendants acted arbitrarily by (1) imposing the sixteen conditions that did not have any legitimate basis, (2) improperly basing their decision in denying Henry's application for a conditional use permit upon community opposition, and (3) requiring Henry to rebut the public's opposition to Henry's plan to build townhouses.[144]

### 2. Discussion of Law.

In order to prevail on a substantive due process claim, a plaintiff must establish the following elements: (1) that the plaintiff has a property interest, (2) that the defendants deprived the plaintiff of his property interest, and (3) that the defendants' actions were so far beyond the outer limits of legitimate government action that no process could cure the defendants' actions.[145] "In more recent decisions, the Supreme Court has narrowed the scope of substantive due process protection in the zoning context so that such a claim can survive only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning."[146] Importantly, state law and not the Fourteenth Amendment creates a property interest.[147]

From the Court's survey of relevant Fourth Circuit case law, there are three different situations where a developer may file a substantive due process challenge to a decision denying the developer's plan to develop property. In the first situation, state law expressly provides that the developer does have a protected property interest in his development plan. If this is established, the Fourth Circuit proceeds to the second and third prongs of the substantive due process analysis, set forth above, and reviews whether the defendants' actions violated the developer's protected property interest.[148]

In the second situation, state law expressly provides that the developer does not have a protected property interest in his development plan. Therefore, the Fourth Circuit dismisses the substantive due process challenge under these circumstances.[149]

In the third situation, it is less certain whether state law provides the developer a protected property interest in his development plan. In this case, the Fourth Circuit requires that the developer "must have more than an abstract need or desire for [the requisite permission to proceed with his development plan]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim

---

**144.** Henry also argues that Raco denied Henry's due process rights by advising Henry not to rebuild his restaurant. However, as previously mentioned, Henry has not provided evidence in support of his allegation that Raco made these statements, *see supra* notes 106–07 and accompanying text.

**145.** *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 827 (4th Cir.1995).

**146.** *Id.* at 827–28 (citing *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977); *Village of Belle Terre v.*

*Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974)).

**147.** *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent sources such as state law").

**148.** *See infra* notes 153–57.

**149.** *See infra* notes 158–59.

of entitlement to it."[150]  A person has a legitimate claim of entitlement to a development plan if the individuals reviewing the plan "lack[ ] *all* discretion to deny issuance of the permit or to withhold its approval. Any significant discretion conferred upon the [individuals reviewing the plan] defeats the claim of a property interest."[151]  Accordingly, the Fourth Circuit focuses on whether the state law provides the defendants significant discretion in determining whether to grant or deny the developer's plan.[152]

### i. The First Situation.

In *Scott v. Greenville County*,[153] the Fourth Circuit addressed the first situation: where state law expressly provided the developer a property interest in his development plan.  The Fourth Circuit concluded that the developer "held a cogni-

zable property interest, rooted in state law, to which federal due process protection extended."[154]  The developer had complied with all of the requirements under the zoning ordinance for obtaining a building permit.[155]  As well, the South Carolina Courts ordered that the developer's permit be immediately issued.[156] Therefore, the Fourth Circuit proceeded to analyze the defendant's actions under the second and third prongs of the substantive due process analysis.[157]

### ii. The Second Situation.

In contrast, in *Greenspring Racquet Club v. Baltimore County*,[158] the Fourth Circuit addressed the opposite situation: where the developer does not have a protectable property interest in his development plan.  The Fourth Circuit concluded that the developer did not have a protect-

---

**150.** *Board of Regents*, 408 U.S. at 577, 92 S.Ct. 2701; *see also Gardner v. Baltimore Mayor & City Council*, 969 F.2d 63, 68–69 (4th Cir.1992) (stating that the *Roth* "claim of entitlement" standard applies to substantive due process challenges to land-use decisions). *But see* Kenneth B. Bley & Tina R. Axelrad, *The Search for Constitutionally Protected "Property" in Land–Use Law*, 29 URB. LAW. 251, 269–75 (1997) (criticizing the entitlement analysis to substantive due process challenges to land use restrictions).

**151.** *Gardner*, 969 F.2d at 68 (emphasis in original).

**152.** *See infra* notes 160–74.

**153.** 716 F.2d 1409 (4th Cir.1983).

**154.** *Id.* 1418–19 (footnote omitted).

**155.** *Id.* at 1418 ("Scott's plans ... fully complied with the requirements of the zoning ordinance in effect as of the date on which he formally applied.").

**156.** *Id.* at 1413 (stating that the trial court ordered the immediate issuance of the permit

and the South Carolina Supreme Court upheld this order on appeal).

Similarly, in *Marks v. City of Chesapeake*, 883 F.2d 308 (4th Cir.1989), a developer secured the necessary changes in the zoning ordinance to proceed with his planned development, *id.* at 309.  Consequently, in reviewing a substantive due process challenge to the denial of his application for a conditional use permit, the Fourth Circuit proceeded with the second and third prongs of the substantive due process analysis: whether the defendants deprived the plaintiff of his property interest, and whether the defendants actions were so far beyond the outer limits of legitimate government action that no process could cure the defendants' actions, *id.* at 311–12.  Therefore, the Fourth Circuit implicitly concluded that the zoning changes provided the developer a protected property interest to which substantive due process protections attached.

**157.** *Scott*, 716 F.2d at 1419 ("Having determined that Scott correctly claims a constitutionally protected property interest, we must now consider whether its deprivation was attended by that process which was Scott's due.") (citations omitted).

**158.** Nos. 99–2444, 00–1012, 2000 WL 1624496 (4th Cir. Oct.31, 2000).

able property interest in his development plan because a zoning ordinance specifically precluded the developer from proceeding with his development plan. Accordingly, the Fourth Circuit dismissed the developer's substantive due process claim.[159]

### iii. The Third Situation.

Finally, in *Gardner v. Baltimore Mayor & City Council*,[160] *Biser v. Town of Bel Air*,[161] and *Sylvia Dev. Corp. v. Calvert County*,[162] the Fourth Circuit addressed the third situation and focused on whether state law provided significant discretion in determining whether to grant or deny a developer's plan. In *Gardner*, the Fourth Circuit considered three factors significant in its conclusion that the planning commission's role was "more than merely ministerial."[163] First, various state agencies outside the planning commission provided input to the planning commission.[164] Second, the regulations did not provide substantive criteria for the planning commission to evaluate the sufficiency of development plans.[165] The Fourth Circuit concluded that "[i]t is evident from the variety of agencies from which evaluations are sought that the Planning Commission may find a [development plan] inadequate on any number of grounds."[166] Third, the regulations provided that the planning commission will not approve the final development plan until the city deemed ac-

ceptable the dedications of land to the city.[167]

In *Biser*, the zoning ordinance provided the board of appeals a flexible standard, and therefore significant discretion, to determine whether to grant a special exception.[168] Specifically, under the ordinance, the board "had to determine whether granting the exception 'would adversely affect the public health, safety, security, morals or general welfare, or would result in dangerous traffic conditions or would jeopardize the lives or property of people living in the neighborhood.'"[169] Furthermore, the zoning ordinance set forth eighteen separate factors for the board to consider in evaluating an application for a special exception. Consequently, the Fourth Circuit concluded that the board had significant discretion.[170]

In *Sylvia Dev. Corp.*, the Fourth Circuit reviewed the county zoning ordinance and concluded that the developer did not have a property interest in the approval of a special zoning designation.[171] Although the county board of commissioners did not have discretion in creating the special zoning designations in the first place, the zoning ordinance provided the board discretion to determine both the location and whether to approve the special zoning designation.[172] Furthermore, the criteria set forth by the zoning ordinance for land to

159. *Id.* at *7.

160. 969 F.2d 63 (4th Cir.1992).

161. 991 F.2d 100 (4th Cir.1993).

162. 48 F.3d 810 (4th Cir.1995).

163. 969 F.2d at 69.

164. *Id.* at 70.

165. *Id.*

166. *Id.*

167. *Id.*

168. 991 F.2d at 104.

169. *Id.* (quoting the zoning ordinance).

170. *Id.* ("It is difficult to imagine a more flexible standard.").

171. 48 F.3d at 826.

172. *Id.*

qualify for the special zoning designation were mere preconditions that must be met in order for such land to be considered for the special zoning designation.[173] As well, the Fourth Circuit considered significant that the zoning ordinance provided for numerous reviews and numerous interpretive judgments that must be met for land to qualify for the special zoning designation.[174]

### 3. *Analysis.*

This case before this Court is distinguishable from *Scott v. Greenville County*.[175] In contrast to the developer in *Scott*, Henry did not complete all of the requirements for obtaining a conditional use permit; [176] the Commission denied his application. In contrast to the developer in *Scott*, Henry did not obtain any court order requiring the Commission to grant his application.[177] On the contrary, by Opinion decided November 21, 1997, the West Virginia Supreme Court of Appeals remanded the matter to the Board to issue findings of fact and conclusions of law.[178]

This case is also distinguishable from *Greenspring Racquet Club v. Baltimore County*.[179] In contrast to the ordinance in *Greenspring*, the Ordinance did not specifically prohibit Henry from proceeding with his application for a conditional use permit.[180] Here, the Ordinance, through the five step procedure for obtaining a conditional use permit, expressly contemplated the development of projects such as Henry's plan to build townhouses.[181]

■ Instead, this case is more akin to the third situation where it is less certain whether state law provides the developer a protectable property interest in his development plan.[182] Therefore, the issue in this matter is whether the Ordinance provides the defendants "significant discretion" in deciding whether to grant or deny Henry's application for a conditional use permit.

From a review of the factors set forth in the prior Fourth Circuit cases, the Court finds that the defendants have significant discretion in reviewing applications for conditional use permits. The Ordinance is similar to the ordinance in *Gardner v. Baltimore Mayor & City Council*[183] in two key respects. First, the Commission, like the planning commission in *Gardner*, considered input from individuals outside the

---

173. *Id.*

174. *Id.*
Importantly, the Fourth Circuit held that the county planning commission's favorable recommendation for the creation of the special zoning designation did not create an entitlement to the special zoning designation. The zoning ordinance only required the board to consider but not follow the recommendation, *id.* at 826–27. Furthermore, the Fourth Circuit held that a court order requiring the board to approve the application did not create an entitlement because that court order did "not mean that the applicant had a preexisting legal right to" the special zoning designation, *id.* at 827 (citing *Biser*, 991 F.2d at 105).

175. 716 F.2d 1409 (4th Cir.1983).

176. *See supra* note 155.

177. *See supra* note 156.

178. *Henry v. Jefferson County Planning Comm'n*, 201 W.Va. 289, 496 S.E.2d 239, 242 (1997).

179. Nos. 99–2444, 00–1012, 2000 WL 1624496 (4th Cir. Oct.31, 2000).

180. *See supra* note 159.

181. Ordinance § 7.3(b)(2)-(6).

182. *See supra* notes 160–74.

183. 969 F.2d 63 (4th Cir.1992).

Commission [184] during the Compatibility Assessment Meeting [185] and Public Hearings.[186] Second, the Ordinance does not provide the Commission substantive criteria to review the input from these individuals.[187] The Ordinance simply provides that "[t]he Planning and Zoning Commission shall issue, issue with conditions, or deny the conditional use permit." [188]

For this reason, the Ordinance, similar to the ordinance in *Sylvia Dev. Corp. v. Calvert County*[189] provides the Commission a flexible standard to review applications for conditional use permits.[190] As well, similar to the ordinance in *Sylvia,* the Ordinance subjects applications for conditional use permits to numerous levels of review.[191] The Ordinance requires that applications for conditional use permits must proceed within the five step procedural framework,[192] and the West Virginia Code provides for two further levels of appellate review by West Virginia Courts.[193]

Therefore, under the various factors set forth by the Fourth Circuit, the Ordinance provides the Commission and Board substantial discretion.[194] Thus, Henry's interest in obtaining a conditional use permit is, at best, a unilateral expectation and not a protected property interest.[195] Accordingly, without a property interest in the conditional use permit, plaintiff's substantive due process argument necessarily fails.[196]

However, even if Henry could establish a protectable property interest in his application for a conditional use permit, he cannot establish that the defendants actions were so far beyond the outer limits of legitimate state action that no person could cure the defendants' actions.[197] First, as previously mentioned, the sixteen conditions all advance legitimate state interests.[198] Second, while it is true that community opposition based upon unfounded prejudice and fears is not a proper grounds to deny Henry's application for a conditional use permit,[199] Henry has not

184. *See supra* note 164.

185. *Id.* § 7.6(a).

186. *Id.* § 7.7(c).

187. *See supra* note 165.

188. *Id.* § 7.6(g).

189. 48 F.3d 810 (4th Cir.1995).

190. *See supra* note 168.

191. *See supra* note 174.

192. Ordinance § 7.3(b)(2)-(6).

193. W. Va.Code §§ 8–24–59 & 8–24–65 (1998).

194. In fact, in his opposition to the defendants' renewed motion for summary judgment, Henry explicitly recognized that the Commission has discretion in reviewing applications for conditional use permits, Pl.'s Opp'n p. 30.

195. *See, e.g., Clift v. Ware,* No. 98–1251, 1998 WL 883490 at *2 (4th Cir. Dec.18, 1998) (discretion forecloses claim of entitlement); *Pathways Psychosocial v. Town of Leonardtown,* 133 F. Supp 2d 772, 792 (D.Md.2001) (same).

196. *See, e.g., Smith–Berch, Inc. v. Baltimore County,* 68 F. Supp 2d 602, 628 (D.Md.1999) ("Plaintiff nowhere asserts an entitlement to the zoning permit. Consequently, [plaintiff's substantive due process argument] must fail.").

197. *See supra* note 145.

198. *See supra* notes 119–41.

199. *See Marks v. City of Chesapeake,* 883 F.2d 308, 312 (4th Cir.1989) ("We therefore think it clear that if, as alleged, the City Council denied Marks' permit application solely in an effort to placate those members of the public who expressed 'religious' objections to the plaintiff's proposed use of his property, it thereby acted 'arbitrarily' and 'capriciously.' ").

provided evidence that the defendants acted upon the public's unfounded prejudices and fears, if any. Third, there is no evidence that Henry was required to rebut the public's opposition to his plan to build townhouses. Although the Ordinance provides Henry a right to rebut the public's concerns at the Public Hearing,[200] Henry did not exercise his right.[201] Furthermore, there is no evidence that the defendants denied Henry's application for a conditional use permit because Henry did not exercise his right to rebut the public's comments.

### 4. *Conclusion.*

Therefore, the Court **DISMISSES** plaintiff's substantive due process claim.

### C. *Third Cause of Action: Equal Protection (Rational Basis).*

### 1. *Plaintiff's Argument.*

Henry argues that the defendants violated his rights under the Equal Protection Clause by treating his application for a conditional use permit different from Lowe's application for a conditional use permit in two ways. First, whereas there were no unresolved compatibility issues with respect to Lowe's application, there were sixteen unresolved issues with respect to Henry's application. Second, the defendants improperly denied Henry's application for a conditional use permit by acting upon public bias, prejudice and fears.

### 2. *Discussion of Law.*

The Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws".[202] The Court reviews Equal Protection claims under the standards set forth in *Sylvia Dev. Corp. v. Calvert County.*[203] First, the Court considers whether the state has created a classification that singles out a particular group of individuals for special treatment. This classification may appear either on the face of the legislation or may be a classification that the state intentionally applied in the administration of the laws.[204] Importantly, therefore, if the plaintiff cannot establish disparate treatment with respect to another similarly situated party, then the plaintiff cannot establish an equal protection claim.[205]

---

**200.** Ordinance § 7.7.(c).

**201.** Pl.'s Ex. E, p. 2.

**202.** U.S. CONST. amend. XIV.

**203.** 48 F.3d 810, 818–25 (4th Cir.1995); *see 2BD Assocs. Ltd. P'ship v. County Comm'rs for Queen Anne's County,* No. 98–1014, 1998 WL 559711, at *3 (4th Cir. Sept.2, 1998) (stating that the Court considers Equal Protection challenges under the analysis set forth in *Sylvia*).

**204.** *Sylvia Dev. Corp.,* 48 F.3d at 819. The Fourth Circuit set forth the following factors to determine whether the defendants have intended to discrimination:

(1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings.

*Id.* at 819 (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 266–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Talbert v. City of Richmond,* 648 F.2d 925, 929 (4th Cir.1981)).

**205.** *Id.* at 825 ("[A]n equal protection claim must be rooted in an allegation of unequal treatment for similarly situated individuals"); *see also Christ College, Inc. v. Board of Super-*

Second, if the plaintiff has identified such a classification, then the Court analyzes the state's actions under the appropriate degree of scrutiny.[206] "As a general proposition, legislation will be sustained if the classification utilized by the statute is 'rationally related to a legitimate state interest.'" [207] "When a statute, however, classifies by race, alienage, or national origin, it is subjected to 'strict scrutiny and will be sustained only if [the legislative means] are suitably tailored to serve a compelling state interest.'"[208] Importantly, the state must have used the classification in order to assert a proper equal protection claim.[209]

### 3. Analysis.

■ Henry has not established the first element of an Equal Protection claim; he cannot establish that both he and Lowe were similarly situated.[210] Both Lowe and Henry had to operate within the five step framework for applying for a conditional use permit.[211] However, the Ordinance classified the properties, upon which both Henry and Lowe sought conditional use permits, in different Zoning Districts. The Ordinance classified Henry's property,

upon which he sought a conditional use permit, as a "Rural–Agricultural District." [212] The Ordinance classified Lowe's property, upon which he sought a conditional use permit, as a "Residential–Growth District." [213] Consequently, the properties, upon which Henry and Lowe applied for conditional use permits, were not similarly situated.

This difference in Zoning Districts is significant because the Ordinance directs the participants at the Compatibility Assessment Meeting to review non-exhaustive compatibility criteria [214] in reference to the Zoning District within which the applicant seeks a conditional use permit.[215] The participants reviewed Henry's application in reference to the stated purpose of the "Rural–Agricultural District": "to provide a location for low density single family residential development in conjunction with providing continued farming activities." [216] Additionally, the participants reviewed Lowe's application in reference to the stated purpose of the "Residential–Growth District" "to provide for a variety of residential uses ... [and the encourage-

visors, No. 90–2406, 1991 WL 179102, at *5–6 (4th Cir. Sept.13, 1991).

**206.** *Sylvia Dev. Corp.,* 48 F.3d at 820.

**207.** *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

**208.** *Id.* (alterations in original).

**209.** *Id.* at 825 ("[A] showing of such disparate treatment, even if the product of erroneous or illegal state action, is not enough by itself to state a constitutional claim."); *see also Forest Ambulance Serv., Inc. v. Mercy Ambulance of Richmond, Inc.,* 952 F.Supp. 296, 306 (E.D.Va.1997) ("Because *Sylvia* requires that classification have been a factor before the equal protection clause is implicated, our plaintiffs fail to state a claim.").

**210.** *See supra* notes 204–05.

**211.** Ordinance § 7.3(b)(2)-(6).

**212.** *Id.* § 5.7.

**213.** *Id.* § 5.4; Pl.'s Ex. K.

**214.** Ordinance § 7.6(b)(1)-(8).

**215.** *See, e.g., id.* §§ 7.6(b)(2) (compatibility with existing development), 7.6(b)(4) (transportation patterns in the area) & 7.6(b)(5) (consistency with land use in areas immediately adjacent to the proposed development).

The Public Hearing, if required, *id.* § 7.6(f), focuses on the unresolved compatibility issues raised at the prior Compatibility Assessment Meeting, *id.* § 7.6(e).

**216.** *Id.* § 5.7.

ment of] commercial growth".[217]

For this reason, it is immaterial, under the Equal Protection Clause analysis, that there were unresolved compatibility issues with respect to Henry's application and that there were no such unresolved compatibility issues with respect to Lowe's application. Accordingly, Henry cannot establish that the defendants have created a classification that singles out a particular group of individuals for special treatment.

However, even if Henry could establish that the properties upon which both Henry and Lowe applied for conditional use permits are similarly situated, Henry cannot establish that the defendants' decision denying his application was not "rationally related to a legitimate state interest."[218] On the contrary, the Board's seven page decision and order entered February 19, 1998, provides detailed findings of fact and conclusions of law. The decision and order indicates that Henry's plan to build townhouses did not conform with both the purposes of the Rural–Agricultural District and the housing in close proximity to the townhouses. The decision and order concludes that the townhouses would, therefore, violate the purpose of the Rural–Agricultural District. Importantly, the decision and order does not cite public bias, prejudice and fears as grounds for denying Henry's application.[219] This is sufficient to pass muster under the lenient rational basis test.[220]

### 4. *Conclusion.*

Therefore, the Court **DISMISSES** plaintiff's equal protection (rational basis) claim.

D. *Fourth Cause of Action: Equal protection (Suspect Classification).*

### 1. *Plaintiff's Argument.*

Henry argues that the defendants violated his rights under the Equal Protection Clause by denying his application for a conditional use permit for racial reasons. Specifically, he alleges that the defendants denied his application because of a fear that racial minorities would inhabit the planned townhouses in the same manner that racial minorities inhabited the Maddex Court.

The parties first dispute whether Henry, a white male, has standing to assert a suspect classification challenge to an equal protection claim.

### 2. *Discussion of Law.*

In *Scott v. Greenville County*,[221] the Fourth Circuit held that a developer, who was not a racial minority, had standing to assert the rights of prospective minority tenants victimized by alleged racial discrimination.[222] The Fourth Circuit first held that the Constitutional requirement of standing was met through the denial of the developer's building permit to build multi-

---

**217.** *Id.* § 5.4.

**218.** *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

**219.** Defs.' Ex. 10.

**220.** On appeal, the Circuit Court of Jefferson County, by Order dated August 27, 1999, affirmed the Board's seven page decision and order entered March 19, 1998, Defs.' Ex. 13.

The Circuit Court determined that "[t]he findings of fact made by the [Board] have sufficiently set forth the factual basis for its determination so that this Court has been able to determine that the [Board's] decision conforms to the standards of the ordinance detailed in Section 6.2 of the Zoning Ordinance." Defs.' Ex. 13.

**221.** 716 F.2d 1409 (4th Cir.1983).

**222.** *Id.* at 1414–16.

family low-income housing.[223] Second, the Fourth Circuit held that the developer possessed a personal stake in the particular rights for which he sought relief.[224] Importantly, the Fourth Circuit held that the developer need not be a member of a racial minority [225] and, as well, the developer need not show nor allege that minorities will in fact reside in the planned development.[226]

### 3. *Analysis.*

■ Henry has standing to assert this equal protection claim. Although he is not a member of a racial minority, the defendants denied his application for a conditional use permit to build the townhouses.[227] As well, Henry has a personal stake to assert the rights of the potential inhabitants of the townhouses.[228]

■ However, Henry has not provided any contemporaneous evidence in support of his claims that the defendants denied his application for a conditional use permit for race-based reasons. At most, plaintiff provides hearsay evidence that, when the neighbors around the Town Run Property circulated the petition on or about March 20, 1994,[229] there were some concerns by unnamed people that people of diverse backgrounds may inhabit the townhouses.[230] Henry does not offer any evidence

---

**223.** *Id.* at 1414–15 ("Scott's claimed injuries stem from the denial of a building permit for his proposed multi-family housing complex, and he fairly alleges that denial of the permit was due to the intervention of the defendants in various capacities into the permit issuance process. Thus we think the constitutional requirement of standing has been met.") (footnote omitted).

**224.** *Id.* at 1415 ("Scott as the developer is a proper plaintiff to assert the rights of prospective minority tenants victimized by the alleged racial discrimination.").

**225.** *Id.* ("[S]tanding to assert that discriminatory government action violated the equal protection clause is not lacking simply because the plaintiff is not a member of a minority.").

**226.** Scott also need neither allege nor show that members of a minority group will in fact reside in the proposed housing in order to satisfy standing requirements. The heart of Scott's racial discrimination claim is that he was singled out for adverse treatment because defendants believed he was willing to contract with and otherwise associate with blacks and other minorities through the building of low-income housing. If allegations that public officials were motivated by racial animus in harming the plaintiff-developer were not themselves enough to confer standing under § 1983, then such officials could almost uniformly foreclose potential liability by successfully destroying the pro-

posed development's prospects at a stage too early for actual occupancy to be ascertained. The uncertainty surrounding carrying any large-scale housing development to fruition— even assuming all public approvals—has not undermined the standing of developers who could not guarantee actual patronage by minorities.

*Id.* at 1415–16 (footnote omitted).

**227.** *See supra* note 223.

**228.** *See supra* note 224.

**229.** Pl.'s Ex. O.

**230.** Q. Did you hear anything about either Hispanics or blacks living there?

A. Just, more or less, it was never mentioned as far as blacks, Hispanics et cetera. They were, more or less, saying it would be a more wide verse of people moving in.

Q. What did you take that to mean?

A. I actually look at it to be as, more or less, not so much the race, but a lot of the, more or less, single family parents trying to raise large families on their own, and it's hard making ends meet. Those type of things I could see as far as being mor of an area where you have lower income people coming in and trying to make ends meet.

Q. Did you ever hear any comments of Lee Morgan about either niggers or Hispanics living there or drug dealers?

A. No.

that the defendants considered race in evaluating Henry's application for a conditional use permit.[231]

### 4. *Conclusion.*

Therefore, the Court **DISMISSES** plaintiff's equal protection (rational basis) claim.

## V. ORDER

For the above stated reasons, the Court **ORDERS** that:

1. the defendants' renewed motion for summary judgment[232] is **GRANTED;**

2. the defendants' motions *in limine*[233] are **DISMISSED AS MOOT;**

3. the plaintiff's motion to stay[234] is **DISMISSED AS MOOT;** and

4. the plaintiff's motion to continue[235] is **DISMISSED AS MOOT;** and

5. this civil action is **DISMISSED** from the active docket of this Court.

The Clerk is directed to transmit certified copies of this Order to the counsel of record.

Dep. of Billmyer, pp. 18–19.

231. Q. At the public meeting, do you remember anyone standing up and saying that the Board, the Planning Commission, should not approve Mr. Henry's project because of the possible influx of racial minorities into the Shepherdstown area?

A. I don't recall that, no.

Q. Do you remember anyone getting up and telling the Jefferson County Planning Commission that they should not approve Mr. Henry's project because of single parents moving into the neighboorhood?

232. Doc. # 86.

233. Docs. #106–1, –2, –3, –4, –6, –8, –9, –10, –11, –12.

234. Doc. # 136–1.

235. Doc. # 136–2.